Elmo V. MYERS et al., Plaintiffs-Appellees,

v.

GILMAN PAPER CORPORATION, Defendant-Appellee,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS (AFL–CIO), et al., Defendants-Appellants.

No. 75–2201.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1977.

Rehearing and Rehearing En Banc Denied March 21, 1977.

J. R. Goldthwaite, Jr., Atlanta, Ga., Louis P. Poulton, Plato E. Papps, Washington, D.C., for IAM, Etc.

Jerome A. Cooper, John C. Falkenberry, Birmingham, Ala., for L. 741 IBEW.

James E. McAleer, Savannah, Ga., Michael H. Gottesman, Frank Petramalo, Jr., Washington, D.C., Benjamin Wyle, New York City, for UPIU.

Louis Sherman, Elihu I. Leifer, Washington, D.C., Stanley Karsman, Savannah, Ga., for IBEW.

Fletcher Farrington, Savannah, Ga., O. Peter Sherwood, Jack Greenberg, Morris J. Baller, New York City, Taylor, Bishop & Lee, Brunswick, Ga., for E. Myers and others.

Guy O. Farmer, II, Jacksonville, Fla., Nolly S. Evans, New York City, for Gilman, Etc.

Abner W. Sibal, Gen. Counsel, E.E.O.C., Joseph T. Eddins, Assoc. Gen. Counsel, Beatrice Rosenberg, Charles L. Reischel, Marian Halley, Washington, D.C., for amicus curiae.

Before RIVES,* GEWIN and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

Three international and five local unions appeal from a district court order finding the unions liable, apportioning the share of liability to be borne by each union, and approving a consent decree between the plaintiffs and defendant employer in this class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and under 42 U.S.C. § 1981.[1] *See Myers v. Gilman Paper Corporation*, 392 F.Supp. 413 (S.D.Ga.1975). Appellees, representing five classes of black employees and former employees of Gilman Paper Company ("the

---

* Judge Rives was a member of the panel that heard oral argument but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. When appropriate, the parties will be referred to as indicated in the text. At times we shall also refer to "appellants" (the unions), "appellees" (the classes of alleged discriminatees),

"defendants" (the unions and the company), and "plaintiffs" (again, the classes of alleged discriminatees). The company has filed a brief with this court in support of the district court order insofar as it approved the consent decree, although the company has not appealed. In addition, the Equal Employment Opportunity Commission has filed a brief.

company"),[2] sought affirmative relief in addition to back pay for alleged racial discrimination in employment, promotions, and transfers by the company and the union defendants. The eight defendant unions are the United Paperworkers International Union ("UPIU"), the International Brotherhood of Electrical Workers ("IBEW"), the International Association of Machinists and Aerospace Workers ("IAM"), UPIU Locals 453, 446, and 958, IBEW Local 741, and IAM Local 1128.[3]

This case is perhaps part of a new era of employment discrimination litigation in the Fifth Circuit. Our cases to date primarily have involved questions of whether Title VII liability could be based on certain company and union practices, such as departmental seniority and rules providing for no transfers between lines of progression or departments and for no posting of vacancy notices. To be sure, issues involving those practices are presented here. However, in this case we are also asked to decide issues of apportioning monetary liability between the company and unions and among the unions themselves based on such discriminatory practices. Further, we must decide the power of a district court in a Title VII action to approve a consent decree negotiated between the plaintiffs and the employer, over union objections, which supersedes certain provisions of collective bargaining agreements not expressly found to be either in violation of Title VII or insufficient to eliminate the present effects of past discrimination. A detailed review of the complex procedural and factual history of this

2. The classes were defined as follows:

*Class A.* All incumbent black employees at the company's St. Mary's location hired prior to September 1, 1972, and continuously employed since that time.

*Class B.* All black persons who worked at the company's St. Mary's location for longer than 12 months whose employment was terminated by reason of retirement or disability between May 4, 1968, and December 31, 1973, and whose names are set forth in Exhibit A. If any individual who could have been included in this case is now deceased, the legal representative of his estate shall be included.

*Class C.* Black persons who have applied or reapplied for jobs at the company's St. Mary's location between May 4, 1968, and December 31, 1973, but who have not been hired or re-hired by the company, and whose names are set forth in Exhibit A.

*Class D.* Those black persons who worked for the company at its St. Mary's, Georgia, location whose employment was terminated between May 4, 1968, and December 31, 1973, and whose names are set forth in Exhibit A.

*Class E.* All black persons who have been terminated since May 4, 1968, who worked for the company for longer than one year, who are not otherwise included in Classes A, B, C, and D, and who sought redress for their discharge through the grievance procedure of the applicable labor agreement, whose claims relating to said discharge were not processed through all stages of the grievance machinery. The names of all of the members of Class E are listed in Exhibit A.

Exhibit A contains the names of two individuals in Class E, two in Class D, eight in Class C, 33 in Class B, and the remainder in Class A. Class A consists in part of 125 individuals who were in the employ of the company in December, 1973, *and* at the time Title VII took effect, July 2, 1965. In addition, Class A consists of 195 people who were in the employ of the company in December, 1973, but who were hired after July 2, 1965. With respect to Class E, the district court found that the unions did not refuse to pursue grievance procedures on racial grounds. 392 F.Supp. at 422. That ruling has not been appealed here. The issues involved in this appeal relate to Classes A and B.

The significance of the May 4, 1968, date in the definitions of classes is apparently related to the 1972 amendment to 42 U.S.C. § 2000e–5(g), which provides that "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission." *See* Pub.L. 92–261, § 4(a), 86 Stat. 103, 1972 U.S. Code Congressional and Administrative News 127. The EEOC charges that resulted in this litigation were filed on May 4, 1970. The right to sue notice, however, was not issued until September, 1972, thus seemingly making the 1972 amendment applicable to this case. *Id.* § 14, 1972 U.S. Code Congressional and Administrative News 135.

3. UPIU and its locals will collectively be referred to as "UPIU" unless otherwise indicated, since those four defendants are represented by the same counsel and have submitted one set of briefs. Similarly, IAM and its local will be referred to as "IAM." The IBEW and its local have submitted separate briefs, as the IBEW challenges primarily the district court's conclusion that the international sufficiently condoned or participated in the local's conduct as to render it liable. IBEW Local 741 will be referred to as "IBEW Local."

case is necessary in order to resolve these difficult issues.

## I. Factual and Procedural Background.

Gilman Paper Company is a New Hampshire corporation that operates two facilities in St. Mary's, Georgia. One is a plant for manufacturing paper bags ("the bag plant"). All of the employees at the bag plant are in a single bargaining unit represented by UPIU Local 958. The other facility is a paper mill ("the mill"). UPIU Locals 446 and 453 represent 72% of the mill employees, with other unions representing the mill's two craft units: IAM Local 1128 represents the machinist unit, which constitutes 18% of the mill work force; IBEW Local 741 represents the remaining 10% of the mill work force, in the electrician unit. Fourteen hundred people work in bag plant or mill bargaining units represented by the unions, 700 at each facility. Plaintiffs represent approximately 369 people, 321 of whom were in the employ of the company in December, 1973. Prior to the effective date of the Civil Rights Act of 1964, July 2, 1965, the company assigned blacks to work in mill jobs traditionally reserved for them: laborer, janitor, unloader, and yard servicer. The UPIU chartered a local union (No. 616) to represent employees in those jobs. After the bag plant opened in 1959, UPIU assigned jurisdiction of the few blacks in that plant to Local 616, even though all other bargaining unit jobs at the bag plant were assigned to the subsequently organized UPIU Local 958, and even though no other mill local represented bag plant employees. There was some testimony that Local 616 initiated inquiries as early as 1963 about merging with the white locals and that an international representative in 1965 may have urged the locals to merge, but a merger was effected in 1970 only upon the express instructions of UPIU.

With the effective date of Title VII, the company began hiring blacks in significant numbers at the bag plant, placing 80 percent of them in traditionally white jobs. However, even after the effective date of Title VII, the company assigned few whites to traditionally black jobs at both facilities. In the late 1960's, for example, Local 616 had only one white member. Fifty-five of the 77 new black hires in the mill between 1965 and 1972 were assigned to "black jobs." The company in 1965 also began considering incumbent blacks for transfers to the lucrative production and maintenance jobs under the jurisdiction of the then all-white locals. From 1965 to 1972 five blacks transferred to formerly white jobs in the bag plant, and thirty blacks transferred to formerly white jobs in the mill, including at least two to IAM maintenance jobs and one to an IBEW job in the powerhouse. Barriers existed, however, to blacks attempting to take advantage of the company's new policy of considering them for transfers to formerly white lines of progression. First, the company reserved the right to deny transfers and would normally deny transfers to persons who were skilled in certain lines. Second, the company had no policy of posting notices of vacancies and was not required to do so by its collective bargaining agreements with the unions. Third, under the collective bargaining agreements a transferring employee could not take his job seniority with him. If he transferred, he gave up his accumulated seniority. As a consequence of these factors, relatively few blacks sought transfer between 1965 and 1972.

During the 1960's and early 1970's the unions occasionally sought to broaden discriminatees' job opportunities. In 1963 UPIU proposed additional language to the collective bargaining agreement guaranteeing "each employee equal opportunity in all aspects of employment." The company rejected the clause and the employees voted to accept the company's last offer rather than to strike. In 1965 the UPIU renewed its proposal of the clause and the company accepted. In 1968 the UPIU sought a provision which would have compelled the company to fill vacancies in lines of progression with existing employees. Under the proposal a labor pool would have been created which would feed all lines of progression on a plant seniority basis. The company rejected this proposal and the employees vot-

ed to accept a contract without such a provision. In 1970 UPIU suggested that all vacancies be posted throughout the plant for bidding; that the employee with the greatest plant seniority bidding for a vacancy receive it; that transferring employees be assured that they would not suffer a pay cut upon transfer to a new line of progression; and that transferring employees be able to use their plant seniority to hold a job if confronted with permanent layoffs in their new unit. However, under the union proposal job, not plant, seniority would still govern promotion within lines of progression. The company rejected these and other UPIU proposals, and UPIU struck for four weeks. The primary issue from the bargaining unit membership's viewpoint, however, concerned pension rights, not enhanced job opportunities for blacks.

In August, 1972, the unions and the company negotiated supplemental labor agreements, all of which were executed on August 25, 1972. The agreements were substantially the same and were designed to comply fully with Title VII requirements. They created an "affected class" consisting of all incumbent black and female employees. Henceforth, job vacancies were to be posted throughout the plant, and the most senior employee who bid for a job, measured by plant seniority, would receive it, if qualified. Those affected class employees who accomplished transfers pursuant to this procedure would enjoy in their new lines of progression the use of full plant seniority for all purposes, such as permanent and temporary promotions, demotions, layoffs and recalls. The company agreed that tests would not be used to disqualify any affected employee from a vacancy to which his plant seniority entitled him, unless those tests had first been validated pursuant to federal guidelines. Each affected employee who transferred would receive "rate of pay protection," that is, continuation of his former rate of pay until he progressed in his new line of progression to a job paying more than he had been receiving in his former job. The company agreed to provide training so that affected employees

could qualify for higher-rated jobs. Some lines of progression were restructured to afford discriminatees quicker access to preferred jobs.

The instant proceedings grow out of charges filed with the Equal Employment Opportunity Commission on May 4, 1970, by plaintiff class representative Myers and eight other blacks. On September 1, 1972, only a few days after execution of the supplemental labor agreements, Myers and 27 other blacks instituted a class action against the company and unions based on section 1981. After Myers received a right to sue notice on September 20, 1972, from the EEOC, the complaint was amended to allege that defendants were denying to plaintiff class equality in employment on grounds of their race in violation of Title VII. After 15 months of motions and discovery, plaintiffs and the company negotiated a proposed consent decree and tendered it to the court for approval. The unions were originally included in the settlement discussions, but were dropped when it became clear that they would never agree to share partial responsibility for any back pay. The settlement was designed to accomplish a final resolution of the dispute between the plaintiffs and the company, leaving plaintiffs free to pursue their claims against the unions.

The proposed consent decree had three features. First, it contained injunctive relief relating to matters under the company's exclusive control, such as recruitment and hiring. Second, it stipulated that the company's liability for back pay would be $300,000, to be distributed to members of the class, and that the company's liability for attorneys' fees would be $35,000. Third, it contained affirmative relief relating to matters encompassed by collective bargaining, such as transfers and seniority, and expressly declared that its provisions would "supersede and replace" those contained in the supplemental labor agreements. The transfer and seniority provisions in the proposed decree largely copied those contained in the supplemental agreements, except for three major variations: (1) the consent de-

cree's "affected class" comprised only blacks, whereas the supplemental agreements defined the "affected class" to include females as well; (2) the consent decree contained a different rate retention formula from that contained in the supplemental agreements; and (3) the consent decree provided that if an affected class member was the most senior bidder for a vacancy but was not qualified to perform the job, it would be kept open, subject to certain conditions, for him as he became qualified to do it, the job in the meantime to be filled by temporary assignment of other employees.[4]

All of the unions urged the district court not to approve the proposed consent decree. They complained that they would be at a severe practical disadvantage if the company were allowed to settle its back pay liability, and they objected to those aspects of the proposal which would "supersede and replace" provisions in their collectively bargained supplemental agreements. They argued that there had been no finding that the supplemental agreements were insufficient to meet Title VII's requirements, that no one contended that such an insufficiency existed, that they were prepared to prove the sufficiency of the supplemental agreements, and that the court could not override the agreements without first adjudicating them insufficient.

Despite these objections, the court approved the decree provisionally, to be effective January 1, 1975. The court granted union motions to amend their complaints to assert cross-claims against the company with respect to any back pay which might be ultimately awarded against them. The trial on the issue of union liability was held on December 2–5, 1974. On January 14, 1975, the court issued its decision. The court found that there had been Title VII violations up to the adoption of the supplemental agreements. The court gave final approval to the consent decree between plaintiffs and the company, effective retro-

---

4. The job freezing scheme involves the interpretation of several provisions of the decree. Under paragraph II–D an affected class member may bid on any vacancy in a line of progression in which he has worked for at least thirty days. The job must be awarded on the basis of plant seniority. Paragraph II–E provides that if the successful bidder

> is not qualified to hold the job that he has been awarded because he has not performed in successively lower jobs, then the vacancy may be awarded on a temporary basis to the next senior qualified employee who may work the job until the senior [affected class member] bidder becomes qualified. In such instances the . . . Affected Class Employee who is the senior bidder shall be required to work in the lower classifications for as long as is necessary for him to qualify and when the Company determines that he is qualified, then those employees who have held the higher job or jobs on a temporary basis shall be moved back to their former positions.

This provision must be read in conjunction with two others. Paragraph II–I states that in implementing promotions of affected class members "the Company shall take into consideration ability to do the job in question . . . . In determining whether an Affected Class Employee is able to perform a job the Company can consider not only [his] ability to perform the particular job that is vacant, but, in addition, his ability to advance through the line of progression of which that job is a part." Finally, paragraph VI provides that "Each Affected Class Employee who transfers or is promoted to a new job shall be allowed at least thirty days in which to learn his new job." If an affected class employee is found to be unqualified to do a job after thirty days, he can return to the job from which he transferred without any loss of seniority or other rights.

The UPIU interprets these provisions to mean that a job will be held open permanently for the successful bidder. Appellees, however, argue that jobs would not be frozen permanently. Appellees state that the freezing provisions do no operate unless the bidder is not qualified to hold the bid-for job because he has not performed in successively lower jobs in that line and that any affected class member who fails to qualify for a new job or is found unable to advance through the line of progression to the frozen vacancy loses his right to have the job held open. Implicit in this explanation is the concession that the frozen job will be held open, perhaps indefinitely, as long as the successful bidder continues to make progress in the successive jobs required to obtain needed skills.

This somewhat lengthy explanation of job freezing is presented in order to clarify the terms of the consent decree. We are not the arbiter, and this is not the forum for arbitration, of the proper interpretation of the job freezing provisions of the decree.

actively to January 1. The court found the unions "equally responsible" with the company for the 1965–1972 discrimination, and thus held that the unions were "liable for 50% of the economic loss suffered by each individual class member." The court's order also apportioned liability for damages among the three unions representing employees at the mill. The court allocated the unions' share of back pay on the basis of the number of employees represented by each. Thus, UPIU was ordered to pay 72% of the unions' mill share, and the electrical and machinist craft unions were to pay 10% and 18% respectively. Of course, UPIU was held liable for the entire union share arising from the bag plant.

The unions appealed and asked the district court to stay further back pay proceedings. The district court denied those motions, and the unions thereupon moved this court for a stay of such proceedings pending appeal. Plaintiffs countered with a motion that the appeals be dismissed, contending that the decision below was neither a final order nor an appealable interlocutory order. A panel of this court granted the unions' motion for a stay of further back pay proceedings pending appeal and directed that plaintiffs' motion to dismiss the appeal be carried with the case.

## II. Appealability of the District Court's Order.

■ Appellees originally contended that the district court's order was in no way final and appealable. Appellants asked the district court to certify an appeal pursuant to 28 U.S.C. § 1292(b), but the court refused to do so. That refusal is irrelevant, however, if appellants can appeal as of right under section 1292(a). *Sayers v. Forsyth Building Corporation,* 417 F.2d 65, 67 (5th Cir. 1969). Appellants argue that since the court order finally approved the settlement and thus effected certain changes in the collective bargaining agreements retroactive to January 1, 1975, the order was one "granting," "continuing," or "refusing to dissolve" an injunction under section 1292(a). Injunctive provisions of a consent decree have recently been held adjudicative and appealable by this court, and consequently this court has jurisdiction in the instant appeal. *See Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721, 730 (5th Cir. 1976); *United States v. T.I.M.E.–D.C., Inc.,* 517 F.2d 299, 307 n.11 (5th Cir. 1975), *cert. granted,* 425 U.S. 990, 96 S.Ct. 2200, 48 L.Ed.2d 814 (1976).

■ It is settled that an appellate court that has jurisdiction over an interlocutory order containing injunctive relief may reach and decide other aspects of that order even though the others would not be reviewable independently by interlocutory appeal. *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 287, 61 S.Ct. 229, 85 L.Ed. 189, 193–94 (1940); *Mercury Motor Express, Inc. v. Brinke,* 475 F.2d 1086, 1091 (5th Cir. 1973); C. Wright, Federal Courts § 102 (2d ed. 1970). The unions strongly urge us to consider and rule upon the back pay aspects of the district court's order. Indeed, it has been the practice of this court to give guidance to district courts on back pay principles even when those courts have not discussed back pay at all in the orders appealed from. *See, e. g., Swint v. Pullman-Standard,* 539 F.2d 77, 93–98 (5th Cir. 1976); *Watkins v. Scott Paper Company,* 530 F.2d 1159, 1195–97 (5th Cir. 1976). It would seem especially appropriate to consider back pay rulings where, as here, the district court has made specific rulings on a well developed record. *Cf. Hairston v. McLean,* 520 F.2d 226, 231 (4th Cir. 1975). There are likely to be further back pay proceedings in this case and therefore judicial economy dictates that we correct whatever errors exist with respect to the district court's back pay rulings. We shall first discuss the court's liability and back pay rulings before considering appellants' contentions regarding the consent decree.

## III. Liability and Back Pay Rulings.

### A. Seniority Provisions as a Basis for Union Liability.

UPIU, IAM and IBEW Local contend that the district court erred in finding the collectively bargained seniority system to

be an element of the "impenetrable barrier to black employees seeking transfer into traditionally all-white lines" and in finding the unions "equally responsible" with the company for the perpetuation of past racial discrimination. 392 F.Supp. at 419, 423–24. These unions insist that the evidence failed to show that the neutral seniority system in any way caused blacks to remain in the traditionally black lines. Further, UPIU argues that even if the seniority system was a causative factor in the failure of blacks to transfer, the evidence showed that UPIU had a "business necessity" defense peculiar to unions. Finally, the unions contend that the allocation of responsibility and liability between the company and unions conflicts with settled labor law principles of apportioning damages.

The district court found that three factors contributed to the inability of blacks to transfer: the failure of the company to post notices of job vacancies, the general practice of the company to disallow transfers of workers experienced in a line of progression, and the job seniority system as implemented by thé collective bargaining agreements. 392 F.Supp. at 420, 423. The unions contend that the company had a "no transfer" policy or practice which was the sole cause of there being no transfer opportunities for blacks. If the company did indeed have such a policy, the unions are correct in arguing that they cannot be held liable, for both the statute[5] and our cases require a nexus between a defendant's behavior and the injuries for which back pay is sought from him. E. g., United States v. Georgia Power Co., 474 F.2d 906, 922 (5th

Cir. 1973); Jinks v. Mays, 464 F.2d 1223, 1226 (5th Cir. 1972).

Although the company retained the right to grant or to deny transfers as a management prerogative and would generally deny transfer requests from workers deemed proficient in particular lines of progression, it is undisputed that the company granted at least 20 transfer requests from black employees between 1965 and 1972.[6] None of the parties produced clear evidence of the number of requests for transfer before 1972, but there was evidence that numerous new and renewed requests for transfer were made after the supplemental labor agreements took effect and that requests before that time might have been deterred by the system of line seniority. On this evidence the court could find that blacks were partially or wholly deterred by the seniority provisions from even requesting transfer; some of the requests would have probably been denied, but some would undoubtedly have been granted. The court therefore, did not clearly err in finding the seniority provisions to be a "concurrent" cause of perpetuation during the period 1965–72 of the company's past discrimination. In this circuit such a finding exposes defendant unions to back pay liability. Sagers v. Yellow Freight System, Inc., supra at 728; United States v. T.I.M.E.–D.C., Inc., supra at 316; Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1373 (5th Cir. 1974).

UPIU insists that the district court erred in holding that UPIU had not proven a "business necessity" defense. But UPIU does not contend that there was a business necessity for the seniority system

---

5. The general remedial provision of Title VII provides in pertinent part:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the un-

lawful employment practice), or any other equitable relief as the court deems appropriate. 42 U.S.C.A. § 2000e–5(g).

6. Appellees argue that the evidence shows that 35 blacks obtained transfers to traditionally white lines during this period. UPIU argues that at least 15 of these "transfers" were really transfers of job classification, not individuals, resulting from merger of the black and white locals in 1970. Accepting the union view of the evidence, however, leaves the fact of 20 transfers.

to be based on departmental lines. Rather, it says that it signed the collective bargaining agreements out of business necessity, having unsuccessfully attempted to prod the company into Title VII compliance. What UPIU seeks might more appropriately be called a "union function" defense rather than a "business necessity" defense. The latter speaks to the immediate and compelling economic need for maintaining a particular policy or collectively bargained provision. *Franks v. Bowman Transportation Co.*, 495 F.2d 398, 415 (5th Cir. 1974), *rev'd on other grounds*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Jones v. Tri-County Elect. Co-op., Inc.*, 512 F.2d 1 (5th Cir. 1975); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 245–46 (5th Cir. 1974). UPIU is here arguing for a defense based upon a union's role in the employer/union relationship. UPIU reasons as follows: the employer owns the plant and manages it; accordingly, the employer possesses the unilateral power—unless surrendered in collective bargaining—to determine where a newly-hired employee will be assigned, how he will be paid, whether he will be allowed to transfer, and what rules will govern his opportunities for promotion. In contrast to this direct role exercised by the employer, a union's role is reflexive: it seeks to influence the resolution of those questions for the benefit of the employees. Unless the union succeeds in getting an employer's agreement on these questions, the employer retains the same unilateral power it would possess if the plant were unorganized. *See United Steelworkers v. Warrior and Gulf Co.*, 363 U.S. 574, 583, 80 S.Ct. 1347, 4 L.Ed.2d 1409, 1418 (1960).

UPIU contends that given this limited union role, a union has a good defense to back pay liability where it has urged the employer to comply with Title VII and has taken a bargaining position to achieve compliance yet lacks sufficient bargaining power to obtain employer agreement. This argument is not relevant to the primary issue below—whether a defendant is or has engaged in conduct that discriminates on the basis of race or that perpetuates past discrimination. Rather, the argument is germane as to which defendant should bear primary responsibility for the illegal conduct. The court did not err in holding that UPIU had no "business necessity" defense.

In their briefs the parties on appeal have argued at length over the district court's holding that "[b]ecause the Unions are equally responsible, with the Company, for the perpetration [sic] of past racial discrimination, they must bear liability equally with the Company. Accordingly, the Unions shall be liable for 50% of the economic loss suffered by each individual class member." 392 F.Supp. at 423–24. The UPIU and IBEW Local indicate that this ruling disposed of their cross-claims against the company and saddled them with ultimate liability for 50% of the back pay awards.[7] The record and court's order, however, are at most ambiguous on the cross-claim issue. In the first paragraph of its order the court stated that it was faced with only one substantial issue—the liability of the IBEW. Further, the court noted that because of the settlement between the plaintiffs and the company, "focus during the trial of the liability phase . . . shifted primarily to the acts and omissions of the defendant

7. Although the UPIU and IBEW Local raise the issue of the 50% ruling as though the court made a final determination of union and company liability, the briefs of both acknowledge that the court allowed them "to assert cross-claims against the Company with respect to any back pay which might ultimately be awarded against the unions." UPIU Brief at 5, 16 n.52; IBEW Local Brief at 16. Moreover, the UPIU and IBEW Local acknowledge that further back pay proceedings are required before any back pay is "ultimately awarded against the unions." *E. g.*, UPIU Brief at 5–6. Indeed, the UPIU characterizes the court's back pay rulings, including the 50% ruling, as "preliminary." UPIU Supplemental Brief at 3. Plaintiffs consider the cross-claims open for disposition on remand. Plaintiffs Brief at 34, 64. The company's failure to mention the 50% ruling suggests that the cross-claims are viable, and the IAM flatly asserts that "Gilman remains in the case and the extent of its liability has not been settled. . . ." IAM Brief at 41.

In light of these expressions, it is difficult to understand why the UPIU and IBEW Local seem to treat the 50% ruling as the apportionment of *ultimate* monetary liability between the company and the unions.

Unions. Gilman's practices are placed in issue by the Unions' cross-actions *only* as far as they affect the Unions' liability." 392 F.Supp. at 417 (emphasis added). At the end of its order the court observed that soon after the plaintiffs presented back pay claims to the unions it would "set the remaining issues down for hearing" and that the unions would be liable in the proportions set forth in the order unless they could show that "other factors would have prevented an individual's transfer." Moreover, neither the court's order setting the trial date nor the plaintiffs' pretrial statement of the Stage I issues referred to the cross-claims. It therefore appears that the court preserved the cross-claim issues for consideration along with ordinary "Stage II" back pay proceedings. See part III, E *infra.* That the court did not dispose of the cross-claims is more strongly suggested by the fact that the company's brief attempts neither to criticize nor to defend the 50% ruling.

The 50% ruling thus appears to be a preliminary ruling, perhaps thought desirable for back pay proceedings because a portion of the back pay claims had to be attributed to the company's settlement. The district court correctly viewed the company and the unions as joint wrongdoers whose concurrent acts caused plaintiffs' injuries. *Accord, Carey v. Greyhound Bus Co.,* 500 F.2d 1372, 1379 (5th Cir. 1975); *Guerra v. Manchester Terminal Corporation,* 498 F.2d 641, 645 n.3, 655–56 (5th Cir. 1974). The proceeding below appears properly to have been limited only to defendants' liability to plaintiffs, for a complex factual determination of the defendants' relative culpability should not interfere with plaintiffs' case. Postponing disposition of the cross-claims until individual back pay claims are resolved in Stage II has the additional benefit of giving the company an incentive to cooperate with the unions in their defense of individual back pay claims, since the company as well as the unions will have an interest in minimizing total back pay liability.

Consequently, full consideration of the unions' cross-claims may be made on remand. Although this court has never outlined in full the principles that should guide district courts in apportioning liability among defendants, we have alluded to the problem. *See United States v. United States Steel Corporation,* 520 F.2d 1043, 1060 (5th Cir. 1975), *cert. denied sub nom. United States Steel Corporation v. Ford,* —— U.S. ——, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Gamble v. Birmingham Southern Railroad Co.,* 514 F.2d 678, 686–87 (5th Cir. 1975); *Guerra v. Manchester Terminal Corporation, supra; Johnson v. Goodyear Tire & Rubber Company, supra* at 1381, 1382. We commend those cases to the district court.

## B. IBEW Liability.

IBEW attacks the district court's holding that it is liable for the perpetuation of discrimination by its local's collective bargaining agreements with the company even though the local is not its agent and it was not a signatory to the contracts. IBEW concedes that one of its international representatives attended the 1970–73 contract negotiations of its local in an "advisory role" and that its president approved the 1968–70 and 1970–73 contracts. The international argues, however, that it cannot be held liable for the effects of its local's contracts unless there is specific proof that it caused, participated in, or ratified its local's acts or omissions. According to this argument, since there is no specific evidence in the record that the international's representative advised the local regarding the seniority provisions or that its president was aware of the discriminatory effects of the facially neutral provisions, it cannot be held liable.

▉ Labor organizations, as well as employers, have an affirmative duty to take corrective steps to prevent the perpetuation of past discrimination. *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40, 60 (5th Cir. 1974), *cert. granted,* 425 U.S. 990, 96 S.Ct. 2200, 48 L.Ed.2d 814 (1976); *Carey v. Greyhound Bus Co., supra* at 1377; *Pettway v. American Cast Iron Pipe Co., supra* at

236. "It is the reasonably certain prospect of a backpay award that 'provide[s] the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.' " *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–2372, 45 L.Ed.2d 280, 296–97 (1975). There must be a "sufficient connection" between the labor organization and the discriminatory practice to render the organization liable. *Sagers v. Yellow Freight System, Inc., supra* at 737. The Fourth Circuit has recently held that a sufficient connection exists where, as here, the international union provided an "advisor" to the local in its negotiations and the international approved the resultant collective bargaining agreement. *See Patterson v. American Tobacco Company*, 535 F.2d 257, 270–71 (4th Cir. 1976). *See also Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Machine Operators*, 525 F.2d 1354, 1359–60 (9th Cir. 1975).

IBEW argues, however, that its policy is to limit its approval to what is apparent from the face of the collective bargaining agreement. We do not think the instant case differs from *Patterson, supra*, and we do think *Patterson* is correct. Here the international established a close relationship with its locals, under which the international would generally provide advisors who would review and often comment upon the local's bargaining positions. An additional aspect of the relationship was the international's requirement that locals submit contracts to it for its approval. The international obviously expected benefits, tangible and intangible, from this relationship. It cannot now claim that it limits the relationship's scope to encompass only the benefits and not the burdens. As far as third parties were concerned, the international gave its imprimatur to local contracts by providing contract advisors and approval of the final agreement. No doubt the international would have been willing to claim whatever advantages that arose from this appearance of full approval; it cannot now disclaim the disadvantages.

## C. Apportionment of Liability Among the Unions.

The district court ruled that for purposes of further back pay proceedings, the unions' share of liability in the mill, where UPIU, IAM, and IBEW locals represent different bargaining units, would be apportioned among the unions on the basis of the number of employees represented in each unit. Accordingly, the court concluded that UPIU and its mill locals would be liable for 72% of the unions' share, IAM and its local would be liable for 18%, and IBEW and its local would be liable for 10%. The unions contend that since a more precise determination of the loss caused by the collective bargaining agreements of each can be made, the district court erred in apportioning liability as it did. They argue that it will be relatively easy to determine in the back pay proceedings the exact number of vacancies open in the electrical unit, for example, and that it will be easy to determine who would have obtained the positions and when they would have been obtained absent the discriminatory practices. Therefore, a precise calculation is possible of the economic loss caused by the bargaining agreement of a particular unit. Such a calculation, it is argued, might bear no resemblance to the apportionment made by the lower court.

While such a method of calculating the liability of each union might be possible or perhaps desirable, we are reminded that district courts are afforded wide latitude in fashioning Title VII remedies. *Rodriguez v. East Texas Motor Freight, supra* at 61; *Johnson v. Goodyear Tire & Rubber Co., supra* at 1380. Here the district court was concerned about rules to govern the remedy for a discriminatory system of jobs caused by the joint acts of the unions and the company. Being jointly responsible for the creation and maintenance of this system, each had an affirmative obligation to seek Title VII compliance. Had one of the unions, for example, force-

fully brought Title VII's requirements to the company's and the other unions' attention, that might have provided the necessary stimulus for some or all of the other joint wrongdoers to end the violations. There was some evidence that the UPIU did undertake to bring Title VII's requirements to the company's attention and was rebuffed, but who can say that the company might not have had a different response had the IBEW and IAM strongly supported UPIU's position? Therefore, the omissions of IBEW and IAM make them in part responsible for the losses suffered by blacks throughout the entire work force. Likewise, UPIU bears partial responsibility for the obstacles to black entry to craft jobs. Incumbent blacks who were deterred from seeking transfers to those jobs were members of UPIU bargaining units. It is settled that Title VII required UPIU at some point to take "the affirmative step to initiate negotiations with [the company] in an effort to salvage for its own ex-members the seniority they would inevitably and foreseeably lose." *Carey v. Greyhound Bus Co., supra* at 1379. Consequently, each union was not exclusively responsible for the losses arguably traceable to provisions of its own contracts. The craft unions might have good cause for complaint if the district court assessed 50% of the unions' share against them, since UPIU represented the great majority of mill employees. It is logical to apportion liability instead on the basis of each union's numerical strength in the plant, which may roughly reflect the relative strength of each union with the employer. The district court could properly conclude that such an apportionment should be based on the percentage of mill employees represented by each union.

D. The Presumptive Entitlement to Back Pay of Those Hired after the Effective Date of the Act.

 The district court held that members of plaintiff classes A and B who were initially assigned to a black job are presumptively entitled to an award of back pay. As observed in note 2 *supra*, those classes consist primarily of blacks hired af-ter July 2, 1965. Union liability for the existence of a neutral seniority system must be based on a finding that the seniority system perpetuates or perpetuated the employer's discrimination in hiring or assigning workers. *Swint v. Pullman-Standard, supra* at 98, 99. *Stevenson v. International Paper Co.,* 516 F.2d 103, 111–12 (5th Cir. 1975); *Watkins v. United States, supra* at 1167; *Johnson v. Goodyear Tire & Rubber Co., supra* at 1373. Consequently, the conclusion below that the unions are presumptively liable to members of classes A and B, whether hired and assigned prior to or after July 2, 1965, must rest on a finding that the company assigned workers both before and after that date on a discriminatory basis.

The evidence below showed that of the 77 Class A members hired after July 2, 1965, in the mill, 55 were assigned to traditionally black jobs. However, of the 118 Class A members hired in the bag plant, 95 were assigned to formerly white jobs. Thus, of the 195 Class A members assigned to jobs after the effective date of the Act, 117 were assigned to white jobs and only 78 were assigned to black jobs. Further, the testimony of John Love, the company's Assistant Industrial Relations Director, was that after July 2, 1965, the company's employment program was nondiscriminatory and that individuals were assigned without regard to race. This testimony was elicited both by counsel for the defendants and by counsel for the plaintiffs. The district court, after stating the facts, concluded by saying that "the evidence shows and the Court finds that, *prior to the effective date of Title VII*, Blacks were hired into relatively low paying lines . . . and were prohibited from entering the higher paying lines . . . ." 392 F.Supp. at 419 (emphasis added). Nowhere in the court's opinion does there appear any conclusion or finding that the employer continued to hire or to make initial assignments on a discriminatory basis after July 2, 1965. It therefore appears that the finding of post-Act employer discrimination in assignments necessary to impose liability to post-Act hires on the unions is lacking.

■ Appellees contend, however, that the evidence made out a prima facie case of post-Act employer discrimination. A substantial disparity between the proportion of blacks and whites assigned to certain job classifications can be sufficient to establish a prima facie case of employment discrimination. *E. g., Robinson v. Union Carbide Corporation,* 538 F.2d 652, 660 (5th Cir. 1976); *Sagers v. Yellow Freight System, supra* at 729–30; *Wade v. Mississippi Cooperative Extension Service,* 528 F.2d 508, 516–17 (5th Cir. 1976). But the record clearly demonstrates that the parties and court below proceeded on the assumption that the company ceased its discriminatory hiring and assignment practices on July 2, 1965. Appellees' principal theory throughout the litigation appears to have been that the company discriminated in the assignment of new hires prior to the effective date of Title VII and that the appellants perpetuated the effects of that pre-Act assignment discrimination. At no time below did appellees expressly assert that assignment discrimination continued after the Act became effective. Indeed, appellees introduced testimony establishing that the company stopped its assignment discrimination with the advent of Title VII. Although appellees arguably made an issue of assignment discrimination in their pleadings, the issue was overlooked in their pretrial statement of issues and in their proposed findings of fact. If appellants and the court ever were on notice of a post-Act assignment discrimination claim, that claim was apparently soon forgotten by everyone concerned, as reflected by the absence of a finding in the lower court's opinion.[8] Consequently, on the present state of the record the court erred in holding that members of classes A and B initially assigned to formerly black jobs *after* July 2, 1965, were presumptively entitled to back pay. Proceeding as a court of equity, the district court may wish to receive additional evidence with respect to initial assignment discrimination after July 2, 1965, and the perpetuation of the effects of that discrimination.

### E. Observations About Further Back Pay Proceedings.

Appellants seem disturbed by what they perceive to be the district court's misunderstanding about burdens of proof in back pay proceedings. It is clear from the court's opinion that it correctly understood the bifurcated nature of discrimination suits and the burden of proof problems presented thereby. As noted above, there is some error in the description of the class presumptively entitled to back pay. The court correctly stated, however, that "[u]pon the trial of the next stage, plaintiffs will be required to show, with reasonable accuracy, the amount of economic loss of each class member who was initially assigned to a black job [before July 2, 1965]." 392 F.Supp. at 424. That procedure follows from our discussion of Title VII proceedings in *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 443–44 (5th Cir. 1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1975):

> A Title VII class action suit presents a bifurcated burden of proof problem. Initially, it is incumbent on the *class* to establish that an employer's [or union's]

8. Plaintiffs argue that they did not lose sight of the post-Act assignment discrimination claim and that the defendants were continually on notice of the issue by the fact that several of the named class representatives, including Mr. Myers, were hired after 1965 and that Mr. Myers testified. Although Myers did testify that his job classifications in the early years following his hiring in May, 1967, were "extra board," "laborer," and "yard bird," the latter two of which were traditionally black jobs, there is no reference in Myers' testimony to any discrimination in these assignments. Myers' testimony as a whole is almost exclusively concerned with the introduction of union records reflecting efforts to merge the black and white locals, the mechanics of filing his EEOC charge in 1970, and his participation in the Black Association of Millworkers. In any event, Myers' testimony and his and others' participation in the instant suit are no substitute for a district court finding that the company continued to make initial assignments on the basis of race after July 2, 1965. And such a finding is a prerequisite for holding the unions liable to post-Act hires on the basis of "perpetuation."

employment practices have resulted in cognizable deprivations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence that the *class* of black employees has suffered from the policies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the covered class, has suffered financial loss, and [is] thus entitled to back pay or other appropriate relief.

*See also Franks v. Bowman Transportation Company, Inc.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444, 466 (1976); *Sagers v. Yellow Freight System, Inc., supra* at 733.

■ In *Pettway v. American Cast Iron Pipe Company, supra* at 259–60, we stated in greater detail the burden upon an individual claimant in Stage II proceedings. The individual claimant should be required to come forward with a statement of his current or last position and pay rate thereof, the jobs he was denied because of discrimination and their pay rates, a record of his employment history with the company and other evidence that qualified or would have qualified him for the denied positions, and an estimate of the amount of requested back pay. The defendants are then entitled to present evidence showing, for example, that the claimant was in fact unqualified or that there was no vacancy at the time or times he would have requested transfer. *Franks v. Bowman Transportation Company, Inc., supra* at 773 n.32, 96 S.Ct. at 1268 n.32, 47 L.Ed.2d at 466 n.32.

## IV. Challenges to the Consent Decree.

The unions all vigorously object to the district court's approval of the settlement between the company and plaintiffs. They insist that the court had no power to substitute a Title VII remedy negotiated by a small group of employees and the company for the August, 1972, collectively bargained Title VII remedy, without any finding that the latter is unsatisfactory under Title VII.[9] We find ourselves in substantial agreement with the unions' contention.

■ Before a court can grant *any* relief in a Title VII suit, it must find that the defendants engaged in the unlawful employment practice alleged in the complaint. 42 U.S.C. § 2000e–5(g); Cf. *United States v. T.I.M.E.–D.C., Inc., supra* at 319. The amended complaint in the instant case, filed exactly one month after the unions and the company executed the 1972 supplemental labor agreements, alleged that the unions entered into collective bargaining agreements which *tend* to perpetuate the effects of the company's discriminatory acts by failing to provide carryover, or plant, seniority. In addition, the amended complaint alleged that the unions had *and were continuing* to violate their duty of fair representation by among other things, failing to negotiate or to attempt to negotiate the elimination of the offending bargaining agreement provisions. The amended complaint thus raised substantial questions concerning perpetuation of discrimination both in the past and at present. There is an important reason for distinguishing between past and present discrimination, for different remedies are involved. Back pay is the remedy for past wrongs; injunctive and other equitable relief is the remedy for continuing wrongs. *Pettway v. American Cast Iron Pipe Company, supra* at 253. It is clear that once a seniority system is found

9. The decree provides for its effect as follows: The provisions of this Decree shall supersede and replace any and all conflicting terms and provisions of the current labor agreements between the Company and the Defendant Unions on January 1, 1975, and any and all conflicting terms and provisions of all supplemental or side agreements which are currently in effect between the Company and the Defendant Unions, including the supplemental labor agreements entered into between the Company and the Defendant Unions in August 1972.

to be discriminatory, a district court's power to modify it is not affected by the fact that it is a product of the collective bargaining process. *Franks v. Bowman Transportation Company, supra* at 415; *Vogler v. McCarty, Inc.*, 451 F.2d 1236, 1238 (5th Cir. 1971).

The order here appealed from clearly contained findings that the seniority system perpetuated, as the court frequently stated in its order, "until 1972" or "from 1965–72," the effects of the company's pre-Act discriminatory actions. 392 F.Supp. at 418, 419. As we have concluded in part III above, those findings are sufficient for back pay liability to attach to the unions. However, nowhere in its order did the court state or even imply that the supplemental labor agreements were inadequate to end the Title VII violations. Indeed, the court's language, as for example, that the seniority system "prevailing from 1965 to 1972" was a substantial factor in perpetuating discrimination, that blacks "*were* locked-in" due to that system, and that it "was only after . . . the 1972 Supplemental Labor Agreements that significant numbers of black employees sought and received transfers," 392 F.Supp. at 419, 424, 430, can logically be read to mean that perpetuation of discrimination ended with those collectively bargained agreements. Further, in its order approving the settlement, the court made no finding with respect to the adequacy or inadequacy of the supplemental labor agreements. The court simply stated that "[a]n examination of the proposed Consent Decree shows that it follows generally settlements and decrees in other cases involving similar problems in the same industry. *See, e. g., United Papermakers and Paperworkers v. United States*, 416 F.2d 980 (5th Cir. 1969), *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970)." That seminal case, however, did not authorize wholesale revisions of a seniority system absent a finding of present perpetuation. The district court in that case had specifically found that the seniority system "presently discriminates against Negro employees." 416 F.2d at 985.

Since the district court approved the consent decree, the law in this circuit has been significantly clarified. Two recent cases involving paper mills have established that actual findings of inadequacy in the current collective bargaining agreement are the prerequisite to modifying it. *See Watkins v. Scott Paper Company, supra; Stevenson v. International Paper Company, supra.* In both of those cases findings of defects in the seniority systems, as previously modified by memoranda of understanding, preceded affirmative relief. 530 F.2d at 1173, 1183; 516 F.2d at 112–13, 114. In *Stevenson* this court noted that some of the defective aspects of the seniority system had already been voluntarily renegotiated since suit was filed and that therefore "the effect [of those defects] on possible injunctive relief may be minimal." 516 F.2d at 113. Again taking note of the intervening voluntary changes, this court stated that "[o]n remand, the district court should now examine the new system, including the residency period for each job, if challenged by plaintiffs . . . ." *Id.* at 114. In speaking to the broader issue of the approach courts should take in exercising their remedial powers on neutral practices, the court in *Stevenson* said:

> [A] "neutral" seniority system should not be enjoined totally, but should be modified only as it applies to those employees who were previously subjected to discrimination, only to the extent necessary to remove the elements perpetuating that discrimination, and only for a limited period of time. 516 F.2d at 118.

*See also Watkins v. Scott Paper Company, supra* at 1174. *Watkins* and *Stevenson* thus make it clear that before a district court can modify seniority provisions there must be a challenge by the plaintiffs to the present provisions and a finding by the court that the present provisions still perpetuate discriminatory effects of prior action.

Appellees argue that the supplemental labor agreements are inadequate on their face and that such inadequacy allowed the district court to approve major changes

in the seniority provisions without specific findings of defects in those provisions. It is settled that the "rightful place" doctrine governs the judicial remedies for Title VII violations. *Franks v. Bowman Transportation Corporation,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444, 463 (1976); *Watkins v. Scott Paper Company, supra* at 1167–68; *United States v. T. I. M. E.–D.C., Inc., supra* at 317. Under that doctrine courts are to grant affirmative relief to give discriminatees the opportunity to achieve positions that would have been theirs absent discrimination. However, the burden is on plaintiffs seeking modifications of neutral provisions to show that the presence or absence of a particular provision constitutes a "practical impediment" to achievement of rightful places. *Watkins v. Scott Paper Company, supra* at 1174; *Stevenson v. International Paper Company, supra* at 113.

■■■ This burden has become merely theoretical in some instances, however, as this court has found certain types of provisions to be virtually necessary *per se* to achievement of rightful places. *Swint v. Pullman-Standard,* 539 F.2d 77, 102 (5th Cir. 1976); *Watkins v. Scott Paper Company, supra.* Four such categories of provisions relevant to curing the instant perpetuation of discrimination have been identified. Required in virtually all cases like the instant one are provisions for: (1) posting of notices of vacancies and a system of bidding for the jobs based on plant, not department or line, seniority, *e. g., Swint v. Pullman-Standard, supra* at 101–02; *United States v. T.I.M.E.–D.C., Inc., supra* at 319–20; (2) carryover of plant seniority for the standard job security purposes, *e. g., Swint v. Pullman-Standard, supra; Watkins v. Scott Paper Company, supra* at 1175; *Sagers v. Yellow Freight System, Inc., supra; Pettway v. American Cast Iron Pipe Co., supra* at 236, 247–48; *United Papermakers and Paperworkers v. United States, supra* at 997–98; (3) "red circling," or rate of pay protections, *e. g., Swint v. Pullman-Standard, supra; Watkins v. Scott Paper Co., supra* at 1173–74; *Pettway v. American Cast Iron Pipe Co., supra* at 223–24, 248–49;

and (4) job-skipping and advanced level entry for qualified class members, *e. g., Watkins v. Scott Paper Co., supra* at 1183–84; *Stevenson v. International Paper Co., supra* at 114; *Pettway v. American Cast Iron Pipe Co., supra* at 248–49.

■■■ Appellees recognize that the supplemental labor agreements contain effective provisions for posting and bidding, carryover of seniority, and red circling, but contend that those agreements are obviously defective for not containing provisions for job-skipping and advanced level entry, thus requiring no specific finding of inadequacy. We partially agree with this argument. When an existing agreement does not contain one of the four types of provisions discussed above and a court orders inclusion of such a provision, a finding that such a provision was necessary under the rightful place doctrine can be implied. Beyond those four categories, however, *Stevenson* and *Watkins* still require a specific finding that the modification is necessary. The supplemental labor agreements in the instant case provided only for posting and bidding on vacancies in *starting jobs* in lines of progression or in the next highest job in lines in which the starting job is filled by employees who have waived the right to advance (those who have "deadended" themselves). As we held in *Watkins,* "the requirement that jobs be held in sequential order in any line of progression [clearly] has the tendency to 'lock in' formerly discriminated against blacks." 530 F.2d at 1183. The district court therefore was entitled to treat the supplemental agreements as defective on their face and to order inclusion of job-skipping provisions. The job-skipping provision approved by the court was consistent with our past holdings that qualified discriminatees be allowed to bid for jobs beyond the next step in their or other lines of progression. *See Pettway, supra,* at 248; *United States v. Hayes International Corp.,* 456 F.2d 112, 116–19 (5th Cir. 1972); *Long v. Georgia Kraft Co.,* 450 F.2d 557, 562 (5th Cir. 1971). However, the court also approved a closely related scheme giving senior bidders the right to have jobs

in a line of progression "frozen" for them as long as they continue to progress satisfactorily in making whatever sequential advances are needed to qualify for the positions.[10] Such freezing provisions have not had the kind of considered scrutiny by courts in this circuit that the four types of provisions discussed above have had. Since the district court did not make any findings even suggesting that the supplemental agreements were defective in not containing "freezing" provisions, it would be premature for us to consider the issue. Consequently, upon remand the court should make a specific inquiry and specific findings whether "freezing" is required under the rightful place doctrine.

The *Stevenson-Watkins* rule that modifications of neutral contract provisions be supported by findings as to the inadequacy of the existing contract has special force where the court is asked to approve a settlement negotiated by a minority of the employees and the employer, including modifications of the collective bargaining agreement which the union has already sought to bring into compliance with Title VII. This is not a case of continuing employer-union adherence to pre-Title VII arrangements. Here the parties voluntarily agreed to modify their collective bargaining agreements to include most of the drastic, but now standard, remedial provisions we have required. Such voluntary compliance should not be ignored, but rather encouraged. Naturally, the parties remain liable for back pay for their errors of the past. But regardless of past wrongs, a court in considering prospective relief is not automatically empowered to make wholesale changes in agreements negotiated by the employees' exclusive bargaining agents in an obviously serious attempt to comply with Title VII. Allowing such changes without findings of inadequacy in the revised agreements would conflict with the policies reflected in the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA").

We are reminded that while Title VII expresses an important national policy, it does not exist in a vacuum. Important national policies also emanate from the NLRA, among them the principle that terms and conditions of employment are to be shaped by the employer and the exclusive bargaining representative of its employees. In *Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), the Supreme Court discussed the manner in which the policies of these two statutes are to be reconciled and accommodated. The precise issue in *Emporium Capwell* was "whether, in light of the national policy against racial discrimination in employment, the National Labor Relations Act protects concerted activity by a group of minority employees to bargain with their employer over issues of employment discrimination." *Id.* at 52, 95 S.Ct. 977, 980, 43 L.Ed.2d at 17. The court of appeals had held that black employees were entitled to deal directly with their employer in an effort to cure alleged racially discriminatory practices, bypassing the union. The court of appeals reasoned that "concerted activity directed against racial discrimination enjoys a 'unique status' by virtue of the national labor policy against discrimination, as expressed in both the NLRA . . . and in Title VII." *Id.* at 58–59, 95 S.Ct. 977, 983, 43 L.Ed.2d at 21. The Supreme Court, in an opinion by Mr. Justice Marshall, reversed the court of appeals. It refused to carve out a limited exception to the exclusive bargaining principle for the curing of discrimination.

The Court's reasoning is germane here. It perceived dangers to Title VII interests in allowing minority-faction bargaining:

> The decision by a handful of employees to . . . attempt . . . to bargain with their employer . . . may or may not be predicated upon the actual existence of discrimination. . . . Competing claims on the employer's ability to accommodate each [minority] group's demands, e. g., for reassignments and promotions to a limited number of

**10.** *See* note 4 *supra.*

positions, could only set one group against the other . . . . The potential for conflict between the minority and other employees in this situation is manifest . . . [t]he likelihood of making headway against discriminatory practices would be minimal. . . . *Id.* at 67–69, 95 S.Ct. 977, 987–988, 43 L.Ed.2d at 26–27.

In addition, the Court saw such circumvention of the union as a threat to the institution of collective bargaining, the central concern of the NLRA:

Whether [minority employees' rights to be free of racial discrimination] are thought to depend upon Title VII or have an independent source in the NLRA, they cannot be pursued at the expense of the orderly collective-bargaining process contemplated by the NLRA. The elimination of discrimination and its vestiges is an appropriate subject of bargaining . . . [W]hile a union cannot lawfully bargain for the establishment or continuation of discriminatory practices . . . , it has a legitimate interest in presenting a united front on this issue and in not seeing its strength dissipated and its stature denigrated by subgroups within the unit separately pursuing what they see as separate interests. . . .

*Id.* at 69–70, 95 S.Ct. 977, 988, 43 L.Ed.2d at 27–28.

■ *Emporium Capwell,* of course, did not involve negotiations in the context of a pending Title VII action. Obviously, when some of the employees become plaintiffs in a Title VII action, they acquire a status as litigants to discuss with the employer and the union the grounds upon which they are willing to settle their lawsuit. But the teachings of *Emporium Capwell* have application to the court's proper role in adjudicating Title VII actions. And the circumstances of this case point to one such application: a court may not allow the substitution of a solution for past discrimination negotiated between the employer and the plaintiffs for that achieved through collective bargaining unless it first determines that the collectively bargained solution ei-

ther violates Title VII or is inadequate in some particular to cure the effects of past discrimination.

■ The ramifications of *Emporium Capwell* and related problems are thoroughly examined in Lopatka, *Protection Under the National Labor Relations Act and Title VII of the Civil Rights Act for Employees Who Protest Discrimination in Private Employment,* 50 N.Y.U.L.Rev. 1179 (1976). Professor Lopatka argues that the union's function under the NLRA as mediator of various employee interests must be respected when a minority seeks to effect changes in the collective bargaining agreement directly with the employer. *Id.* at 1246–49. He observes that courts are themselves divided over the need for particular provisions to remedy Title VII violations and that when a union has chosen from among arguably acceptable alternatives, a minority of employees should not be given free reign to upset the union's bargain simply because the faction or a court might have subjectively deemed other alternatives better. There are enormous gray areas in the range of remedies for past Title VII violations. As we have noted above, provisions for posting and bidding, carryover seniority, red circling, and job-skipping are not gray areas in this circuit. Thus, if the union has not achieved inclusion of one of those items in the context of an employment practice history such as that presented here, a court can approve such a provision negotiated by the discriminatee faction directly with the employer without any specific proof of the inadequacy of the collective bargaining agreement. Beyond those four categories are gray areas where it is not to be presumed that minority-proposed changes are required under the rightful place doctrine. In addition, there are gray areas within the four categories where fine questions of wording and implementation are involved. Where a union has made a serious attempt to bring the labor contract into full compliance with Title VII, as is clear here, a court should defer to the union's bargained-for remedies in these gray areas unless the discriminatees prove that specific changes

are necessary in order for them to reach their rightful places.

An example of one of these gray areas is the precise language to be used in describing red circling. In the 1972 supplemental labor agreements, red circling was provided whenever an employee transferred to a new line of progression in which the highest job paid more than "the job from which he transferred." The consent decree, however, affords rate retention to a transferee only if the highest job in his new line of progression pays more than "the highest paying job in the line of progression from which he transferred." Appellants argue that the consent decree is thus less beneficial to the plaintiffs than that contained in the supplemental agreements, for if an employee contemplating transfer holds a job paying less than the highest job in another line but there are jobs above him in his present line that pay more than the highest job in that other line, he will not get rate retention under the consent decree though he would have gotten it under the 1972 agreements. Appellees even on appeal have not tried to demonstrate the need for the red circling description of the consent decree. Rather, they argue that the unions' objection is merely theoretical, for no blacks have jobs as hypothesized by the unions. Thus appellees' argument is that it makes no difference which alternative description is used. We have held that the burden was on plaintiffs to show that their alternative is required under the rightful place doctrine. Court approval of alternative wording that is admittedly unnecessary greatly derogates from the unions' role under the NLRA and must be reversed.

The unions devote considerable argument to the definition of the "affected class" in the consent decree. The supplemental labor agreements define the affected class to include females as well as blacks. As a result, the right to transfer with plant seniority and rate retention is available to women as well as blacks. The senior affected class member bidder, whether black or female, is to be given an available position in his or her own line of progression or an entry level position in another line. The consent decree, however, defines "affected class" as blacks only, and under its bidding system "the Affected Class Employee with the most plant seniority" shall be awarded the job opening. Since the terms of the consent decree "supersede and replace" those in the supplemental labor agreements, the decree subordinates senior females to junior blacks.

The unions argue strenuously that the company's policy in implementing the consent decree has been to deprive white females of the rights they gained under the supplemental labor agreements. However, the rights of white females and the company's implementation policy are not at issue in this case. The issue here is the proper accommodation by the district court of national policies underlying the NLRA and Title VII. On that issue we have held that before ordering or approving changes in a collective bargaining agreement, the court must find that the modifications are necessary under the rightful place doctrine; once plaintiffs have made a showing that specific modifications are required, the court is obligated to order or to approve the modifications. The unions are of course correct in expressing concern about the rights of white females under the 1972 agreements. Those rights could not be affected by the consent decree, since white females and some blacks who are included in the "affected class" under the 1972 agreements are not parties to the instant litigation. The company admits in its brief that the rights of those not included in the "affected class" of the consent decree are not affected by it. Indeed, if the company does not recognize the rights of "affected class" members under the 1972 agreements it may have to respond in damages to those employees. *See McAleer v. American Telephone & Telegraph Co.*, 416 F.Supp. 435 (D.D.C.1976). Although the unions have an interest, and indeed a duty, in asserting the rights of females under the 1972 agreement, we do not understand their concern over the company's agreement to seemingly inconsistent obligations.

### V. Conclusion

We affirm the district court's various back pay rulings, with one exception. It correctly held that UPIU, the IAM, and the IBEW Local are liable as parties to collective bargaining agreements that perpetuated the effects of the company's prior discrimination. Further, the court correctly concluded that the IBEW is liable because it participated in the negotiation of and ratified such collective bargaining agreements. During Stage II proceedings, when monetary liability to individual claimants is considered, the unions will be able to pursue their cross-claims against the company for the company's allegedly greater culpability in violating Title VII. It was within the court's discretion to make a preliminary apportionment between the company and the unions for purposes of Stage II proceedings and to make an apportionment among the unions for whatever monetary liability they cannot recover from the company on the cross-claims. However, the court erred, on the present state of the record, in holding those members of classes A and B hired after July 2, 1965, presumptively entitled to back pay.

We reverse the court's approval of the consent decree insofar as it modified the 1972 supplemental labor agreements, except for inclusion of the job-skipping provision. On remand plaintiffs will be entitled to prove that modifications of seniority and promotion practices are required in order for them to reach their rightful places.

Judgment AFFIRMED IN PART; REVERSED IN PART and REMANDED.