Frank L. CARSON et al.

v.

AMERICAN BRANDS, INC., et al.

Civ. A. No. 75–0553–R.

United States District Court,
E. D. Virginia,
Richmond Division.

June 2, 1977.

John W. Scott, Jr., Hill, Tucker & Marsh, Fredericksburg, Va., Jack Greenberg, Barry Goldstein, New York City, for plaintiffs.

Henry T. Wickham, Bradfute W. Davenport, Jr., John F. Kay, Jr., Kenneth V. Farino, Jay J. Levit, Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

### I

Plaintiffs brought this class action against the abovenamed defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended, 42 U.S.C. § 1981 and the Fourteenth Amendment. Jurisdiction is invoked pursuant to 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1343(4).

Negotiations in an attempt to settle the issues raised by the complaint have resulted

in a proposed Consent Decree which the parties requested the Court to enter at the final pretrial conference on 1 April 1977. At that conference, the Court expressed concern that certain provisions of the Decree might be violative of the law and that provisions of the Decree would affect parties other than those before the Court. The Court noted that the parties were jointly seeking entry of the Decree and to that extent were no longer in an adversary posture. The Court requested counsel to brief the issues of concern. The briefs having been filed the Court must now decide whether or not it is just and proper and in accordance with the law to enter the Decree.

## II

Plaintiffs have included a statement of facts in their brief in support of the proposed Consent Decree. For this purpose only, we accept these facts to be true as follows:

The defendant American Brands, Inc., (hereinafter referred to as the "Company"), operates the Richmond Leaf Department of the American Tobacco Company in Richmond, Virginia, for the purpose of processing and storing leaf tobacco. The defendant Local 182 Tobacco Workers International Union has exclusive bargaining rights for the establishment of wage rates and other terms and conditions of employment for all hourly paid production unit positions at the Richmond Leaf Department. The defendant Tobacco Workers International Union is a national organization consisting of local unions, including Local 182.

The plaintiffs are present and former black seasonal employees at the Richmond Leaf Department and held jobs under the jurisdiction of Local 182, TWIU, during their employment. As seasonal employees, the plaintiffs all worked at the Richmond Leaf Plant an average of six months each year. Regular employees worked at this same facility all year.

The Company employs approximately 150 seasonal employees, *all* of whom at the present time are black, and approximately 100 regular employees, of whom 66% are black. Plaintiffs are not aware of any white individuals who have ever been employed as seasonal employees at the Company's Richmond Leaf Plant.

Prior to September 1963, the regular job classifications of truck driver, watchman, maintenance, storage, and boiler operator at the Leaf Plant were reserved for whites only. As of 15 February 1976 these positions were staffed as follows:

| Position | Whites | Blacks |
|---|---|---|
| Truck Drivers | 5 | 4 |
| Watchmen | 15 | 1 |
| Maintenance Storage | 1 | 0 |
| Boiler Operators | 0 | 3 |

Regular employees have the right to obtain any permanent position for which the TWIU has bargaining rights within the Richmond Leaf Department. Seasonal employees have the right to obtain any seasonal position for which the TWIU has bargaining rights within the Richmond Leaf Plant. Seasonal employees may transfer to positions in regular classifications only when no regular employee desires that position. Should the seasonal employee transfer to a regular position, he loses all of his seniority and is treated as a new hire for seniority purposes. Separate seniority rosters are maintained for regular and for seasonal employees.

When a seasonal employee transfers to a regular position he is placed at the bottom of the regular seniority roster irrespective of the number of years he has worked as a seasonal employee with the Company. This loss of seniority affects his status for promotions, demotions, lay-offs, recalls and vacations, and, in short, the principal terms and conditions of his employment.

Since 1971, the vast majority of applicants and new hires at all of the Company's locations in the Richmond area have been black, as indicated by the following chart:

| YEAR | APPLICANTS | | NEW HIRES | |
|---|---|---|---|---|
| | BLACKS | WHITES | BLACKS | WHITES |
| 1971 | 97 | 1 | 88 | 1 |
| 1972 | 118 | 5 | 97 | 2 |
| 1973 | 94 | 4 | 93 | 1 |
| 1974 | 71 | 7 | 64 | 2 |
| 1975 | 77 | 3 | 22 | 2 |

The racial composition of the production unit at the Richmond Leaf Department is as follows:

| YEAR | REGULAR EMPLOYEES | | SEASONAL EMPLOYEES | |
|---|---|---|---|---|
| | WHITES | BLACKS | WHITES | BLACKS |
| 1968 | 41 | 52 | – | 116 |
| 1970 | 40 | 59 | – | 175 |
| 1973 | 40 | 56 | – | 176 |
| 1976 | 37 | 57 | – | 135 |

Of the 35 supervisory positions at the Company's Richmond Leaf Department as of 5 April 1976, seven, or 20%, were filled by blacks. Of the 229 persons in hourly paid production unit jobs at the Richmond Leaf Department in that same year, 192, or 84% were black.

### III

In the proposed Consent Decree defendants "expressly deny any violation of . . any . . . equal employment law, regulation, or order." Plaintiffs conversely state that "consent to this Decree does not constitute a finding or admission that any of the employment practices of . . . [defendants] are lawful." The proposed Decree further states that "the Court finds from the evidence previously filed in the form of answers to interrogatories that there are no discriminatory hiring practices at the Richmond Leaf Department."

In light of the facts outlined above, the foregoing provisions, and the applicable law, the Court questioned the propriety of the following provisions of the proposed Consent Decree:

In full and final settlement of any and all claims for injunctive relief alleged in the Complaint, the parties agree to the following:

1. For the purposes of determining eligibility for vacations and for promotions, demotions, lay-offs and recalls, every current and future regular hourly paid production employee of the Richmond Leaf Department will be credited with actual time worked as a seasonal employee commencing with the date of hire of the last period of continuous employment as a seasonal employee in accordance with Section I of Article 7 of the current collective bargaining agreement governing seasonal employees. The combined total of such seasonal and regular employment will apply toward service requirements for vacations, and for promotions, demotions, layoffs and recalls.

2. Regular employees who have served the probationary period as a seasonal employee during the last period of his or her continuous seasonal employment at Leaf prior to being transferred to regular Leaf employment will become eligible for medical benefits and sick benefits immediately upon such transfer to regular employment.

3. In the event that vacancies in hourly paid permanent production job classifications at the Richmond Leaf Department are not filled by regular production employees, then all qualified hourly paid seasonal production employees will be given the opportunity to fill such vacancies prior to hiring from the outside.

4. In the event that vacancies in the job classification, Watchman, at the Richmond Leaf Department are not filled by regular production employees, then all qualified hourly paid seasonal production employees will be given the opportunity to fill such vacancies prior to hiring from the outside.

5. The Richmond Leaf Department adopts a goal of filling the production supervisory positions of Foreman and Assistant Foreman with qualified blacks until the percentage of blacks in such positions equals ⅓ of the total of such positions. The date of December 31, 1980 is hereby established for the accomplishment of this goal.

## IV

Before discussing these provisions specifically, a general discussion of what this Court perceives to be the controlling law is appropriate.

██ Plaintiffs based this suit on Title VII, Section 1981 and the Fourteenth Amendment. As defendants herein are private parties, the Court does not find the precepts of the Fourteenth Amendment to be applicable *per se*. But the guarantees of the Equal Protection clause against State action by the Fourteenth Amendment nevertheless are afforded plaintiffs by Title VII and Section 1981 which, with respect to private parties defendant, have their underpinnings in the Thirteenth Amendment. This Court is also cognizant that the Supreme Court of the United States has read the guarantees of the Equal Protection clause into the Due Process clause of the Fifth Amendment protecting against arbitrary and capricious [1] federal action.

██ Thus, the Fifth Amendment may well protect citizens against arbitrary and capricious federal action in the form of a federal court Consent Decree that would place a federal stamp of approval, with the full force and effect of contempt proceedings, to what would otherwise be a mere agreement between private parties. *See Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947). In sum, we opine that the mandates of the United States Constitution as well as the statutes invoked by plaintiffs require us to insure that this Court plays no role in perpetuating, promulgating or acquiescing in improper discrimination on the basis of race.

## V

Keeping the above in mind, we shall focus on the law of Title VII as this statute speaks specifically to the area of concern herein, that is, discriminatory employment practices.

Title VII states in pertinent part that it is unlawful:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. [42 U.S.C. § 2000e–2(a)].

The provisions of Subsection (j) read as follows:

(j) *Preferential treatment not required on account of numerical or percentage imbalance.* Nothing contained in this title [42 U.S.C.S. §§ 2000e—2000e–17] shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this title . . . to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by an employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

██ Title VII plainly and distinctly prohibits racial discrimination in any and all

---

1. *See e. g., Richardson v. Belcher*, 404 U.S. 78, 81–82, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Flemming v. Nestor*, 383 U.S. 603, 612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1934).

aspects of employment practices including but not limited to recruitment, promotions, seniority and benefits. The language clearly prohibits discrimination against whites as well as blacks on account of race and clearly makes no exception for alleged benign motives such as rectifying the effects of past discrimination. Indeed, Subsection (j) explicitly states that preferential treatment is not required to rectify racial imbalance. To be sure, Title VII does not exclude use of extraordinary measures to make those individuals who actually suffer from the results of past or present discrimination whole, but such action is more aptly characterized as equitable, not preferential, treatment. And even in this context, the courts have been careful to minimize whatever adverse effects may result with respect to innocent third parties.

The legislative history of Title VII clearly supports what this Court understands to be its clear and unequivocal mandate. In response to a charge that the Title VII appeared to force employers to grant preferential treatment, Senator Harrison Williams retorted:

> Those opposed to H.R. 7152 should realize that to hire a Negro solely because he is a Negro is racial discrimination, just as much as a "white only" employment policy. Both forms of discrimination are prohibited by Title VII of this Act. The language of that title simply states that race is not a qualification for employment. Every man must be judged according to his ability. In that respect, all men are to have an equal opportunity to be considered for a particular job. Some people charge that H.R. 7152 favors the Negro, at the expense of the white majority. But how can the language of equality favor one race over another? *Equality can have only one meaning, and that meaning is self-evident to reasonable men. [Legislative History of Title VII and XI of the Civil Rights Act of 1964, United States Equal Employment Opportunity Commission, U.S. Government Printing Office, 1969, page 3189.]*

Senator Williams' understanding as above expressed in advocating passage of Title VII was shared by Senators Clark and Case:

> There is no requirement that an employer maintain a racial balance in his work force. On the contrary, any deliberate attempt to maintain a racial balance, whatever the imbalance may be, would involve a violation of Title VII because maintaining such a balance would require an employer to hire or refuse to hire on the basis of race. It must be emphasized that discrimination is prohibited as to any individual. [110 Cong.Rec. 7213, April 8, 1964]

Further, at the behest of the bill's sponsors, the Department of Justice submitted a memorandum stating:

> Finally, it has been asserted that Title VII *would impose a requirement of "racial balance."* This is incorrect. There is no provision, either in Title VII or in any other part of this bill that requires or authorizes any federal agency or federal court to require preferential treatment for any individual group for the purpose of achieving racial balance.
>
> No employer is required to hire an individual because that individual is a Negro. No employer is required to maintain any ratio of Negroes to whites, Jews to gentiles, Italians to English, or women to men. [110 Cong.Rec. 7207, April 8, 1964.]

Neither the Supreme Court nor the Fourth Circuit has dealt squarely with the question of the legality of preference and/or quotas under Title VII. However, both Courts have discussed the issue in dicta. In *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) the Supreme Court stated:

> Congress did not intend by Title VII to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what

786

Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification. [401 U.S. at 430–431, 91 S.Ct. at 853].

The Supreme Court, in the more recent decision of *McDonald v. Santa Fe Transportation Co.,* 423 U.S. 923, 96 S.Ct. 264, 46 L.Ed.2d 248 (1976), made clear, though not in the factual context of an affirmative action program, that Title VII's protection from racial discrimination applied to whites as well as blacks. Close in time to *McDonald,* the Court in *Franks v. Bowman Transportation Co.,* 423 U.S. 814, 96 S.Ct. 25, 46 L.Ed.2d 32 (1976) did award constructive seniority and back pay to remedy racial discrimination against blacks and this remedy may have adversely affected seniority rights of innocent white employees. However, this relief was unequivocally restricted to individual, identifiable, persons who were otherwise qualified for the positions they sought but had been denied on account of race.

Similarly, the Fourth Circuit has consistently limited remedial relief under Title VII to actual persons who were victims of unlawful discrimination, thereby minimizing disruption of the working lives and expectations of other innocent employees.

In *Russell v. American Tobacco Co.,* 528 F.2d 357 (4th Cir.) *cert. denied* 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976), a case which appears to be factually close to this one, the Court, with some modification, affirmed the district court's decree. *Russell* was a class action brought by black employees against their employer and union for engaging in racially discriminatory employment practices. The discrimination involved three departments of the company: Leaf, Prefabrication and Fabrication. The Leaf Department was located in Rockingham County and the Prefabrication and Fabrication Departments were housed in the Reidsville plant. Each department had a separate seniority roster. The district court found, *inter alia,* that defendant's discriminatorily preserved higher-paying jobs in the Fabrication Department for white employees after enactment of Title VII. The Circuit Court clarified this finding by holding that the disparity of treatment of the employees at the Leaf Department and the Prefabrication Department was also a product of this discriminatory design:

If Branch and Leaf are both parts of the same operation, this case presents a straightforward application of the well-accepted principle that discriminatory hiring in departments of a business may be remedied by requiring the company to allow transfers between departments, based on plant-wide seniority. *See e. g. Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir. 1971); *Quarles v. Philip Morris, Inc.,* 279 F.Supp. 505 (E.D.Va.1968). . . [Hence] we conclude that regular and seasonal black employees at Leaf *who were hired before the company eliminated discrimination* at fabrication should be permitted to transfer to that department as permanent vacancies occur *in jobs they can perform.* Further, they should receive the training for which they qualify. A transferee's new departmental seniority should be computed from his employment seniority date. The class of employees entitled to back pay should also be enlarged to include Leaf employees. [528 F.2d at 362–364] [Emphasis added.]

Of particular significance, the Circuit Court affirmed the district court's disallowance of what would have amounted to preferential treatment on the basis of race to those black employees among the class of plaintiffs who were not victims of discrimination:

Regular and seasonal Leaf employees also seek entry into the prefabrication department, and many seasonal employees seek regular employment in Leaf on the basis of their company seniority. The district court, finding no racial discrimination in hiring at prefabrication and Leaf, denied their requests. We affirm because the Act does not oblige a company to allow black employees to transfer into depart-

ments that were always open to black applicants without discrimination. *United States v. Chesapeake & Ohio Ry. Co.,* 471 F.2d 582, 588, 593 (4th Cir. 1972); *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 662 (2d Cir. 1971). [528 F.2d at 364.]

The most recent Fourth Circuit case in this area is *Patterson v. American Tobacco Co.,* 535 F.2d 257 (4th Cir. 1976). This Court has discussed its reading of that case at some length in *Cramer v. Virginia Commonwealth University,* 415 F.Supp. 673, 679–680 (E.D.Va.1976). Suffice it to say that *Patterson* did not hold that Title VII allows preferential treatment solely on the basis of race to compensate for unlawful past discrimination. More important, insofar as *Patterson* relates to the facts herein, it states that:

> [Title VII] plainly bans the use of preferential hiring to change a company's racial imbalance that cannot be attributed to unlawful discrimination. [535 F.2d at 273].

▮ Title VII, by its own terms, does not *require* preferential treatment to rectify racial imbalance. This language may be interpreted to mean that, although permissible, it is not mandated. *Patterson* states in no uncertain terms that preferential treatment is banned absent proof of discrimination. As in *Russell* the Court in *Patterson* carefully tailored the relief to cover only actual victims of discrimination. *See also, United States v. Chesapeake & Ohio Railway Co.,* 471 F.2d 582 (4th Cir. 1972).

## VI

Since Executive Order 11246 is also related to this area, discussion on this point is warranted.

The Court has previously discussed this issue, citing appropriate authority, in *Cramer v. Virginia Commonwealth University,* 415 F.Supp. 673, 680–681 (E.D.Va.1976) holding that where Executive Order 11246 is inconsistent with Title VII it is superceded thereby. This Court must additionally note however that the pertinent language of Executive Order 11246 is clearly consistent with the plain language of Title VII:

(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

▮ It is rather the regulations adopted by the Secretary of Labor pursuant to Executive Order 11246 that may be conflicting, in our opinion, with both Title VII and Executive Order 11246. The Secretary's regulations require that contractors develop written affirmative action plans which shall "provide in detail for specific steps to guarantee equal employment opportunity keyed to problems and needs of members of minority groups, including, when there are deficiencies, the development of specific goals and time tables for prompt achievement of full and equal employment opportunity." [41 C.F.R. 60–1.-40(a) (1970)]. Insofar as the above quoted regulation serves as an amorphous and euphemistic mandate requiring preferential treatment and imposition of quotas solely on the basis of race, it contravenes the letter and spirit of Title VII. As Title VII supercedes contravening Executive Orders, *a fortiori,* it supercedes federal regulations represented to be adopted pursuant to such orders.

## VII

Lastly, before examining the provisions in question, something should be said about

the nature and legal significance of consent decrees in Title VII class actions.

A recent Fifth Circuit case, *Myers v. Gilman Paper Corp.,* 544 F.2d 837 (1977), affords some insight in this area. *Myers* was a Title VII class action brought against a company and union by black employees and former employees who sought affirmative relief for alleged racial discrimination in employment, promotions and transfers. The district court found the union liable on the merits. In addition the Court entered and approved a consent decree between plaintiffs and the company. On appeal by the union, the Circuit Court held, *inter alia,* that the district court could not approve a consent decree negotiated between plaintiffs and the company that would allow the substitution of a solution for past discrimination in place of that achieved through collective bargaining unless it first determined that the collectively bargained solution either violated Title VII or was inadequate to cure the effects of past discrimination. 544 F.2d at 858–859.

In the course of its memorandum the Court made a number of pertinent remarks. It noted that "[b]efore a court can grant any relief it must find that the defendants engaged in the unlawful employment practice alleged in the complaint" [544 F.2d at 854]. It further made clear "that before a district court can modify seniority provisions [by consent decree or otherwise] there must be a challenge by the plaintiffs to the present provisions and a finding by the court that the present provisions still perpetuate discriminatory effects of prior action." [544 F.2d at 855].

■ *Myers* is not on all fours with this case particularly in that the union herein has consented to the decree in question, but *Myers* is sufficiently analogous to be of some import. First, and basic, consent decrees, although looked upon favorably by the courts, are not immune from scrutiny in terms of propriety and legality. This principle is especially true in class actions where the effect of the relief usually has widespread and considerable impact both within and outside the class. For good reason

Rule 23(e) of the Federal Rules of Civil Procedure requires that "a class action shall not be dismissed or compromised without the approval of the court . . . ." Further, *Myers* provides us with the foregoing guidelines in deciding whether or not to grant this approval in a Title VII context.

## VIII

With the foregoing review of the law, the Court will consider the several provisions of the proposed Consent Decree.

■ Provision I of the Decree provides that current and future employees who were, or are to be, employed as seasonal workers at the Richmond Leaf Plant shall be credited with seniority for actual time worked at the plant from the beginning of their employment. Since the pool of employees benefiting from this provision, that is seasonal employees, has been traditionally and are now all black, it appears that benefits are being bestowed on the basis of race. Preferential treatment on the basis of race—any race—violates the Constitution and Title VII. It cannot be countenanced by a court sworn not to subvert but to uphold the law. To be sure, legitimate nonracial business reasons may underlie such a decision. But so also, and more likely in this case, could illegitimate racial considerations. If the reason is the former no decree is required. If the reason is the latter no decree is permitted.

Plaintiffs, in their brief in support of the proposed Consent Decree, say that the relief in Provision I is "exactly the same relief" granted in *Russell v. American Tobacco Co., supra.* This assessment is incorrect. There are two paramount distinctions between *Russell* and the instant case: (1) in *Russell* the Court found present discrimination and present effects of past discrimination; (2) the *Russell* Court carefully tailored the relief in an effort to make whole the actual victims.

In the proposed Consent Decree the defendants "expressly deny . . . any unlawful or discriminatory conduct." Plaintiffs state that they make no "admis-

sion" that defendant's conduct, with the exception of present hiring practices, is "lawful." This dichotomy does not create any factual basis upon which relief may be granted. Plaintiff does not, by these words, even deny defendants' assertion.

But assuming for the moment that there is evidence of present discrimination or of the present effects of past discrimination, Provision I is still not in line with *Russell*. The *Russell* Court devised an equitable solution to effect relief for actual victims of discrimination. The relief was not granted to employees because they were black but because they were actual, identifiable, victims of racial discrimination. Indeed, that Court refused relief to certain blacks where no evidence existed that they had suffered from racial discrimination. Contrawise, the parties herein have agreed to allow seemingly preferential treatment for "current and future" seasonal employees not because they are victims of racial discrimination, but because those current employees are black and those future employees will almost surely be black. There was no apparent consideration given to whether or not the preferred employees have been, are, or would be subject to racial discrimination. In short, the considerations which were the essence of *Russell* are absent here.

Provision II would allow all seasonal employees who have already served a probationary period as a seasonal employee to avoid having to serve the additional probationary period as a regular employee that would otherwise be required as a condition precedent to eligibility for medical benefits. The Court has the same concern with this provision as it does with Provision I. If this is a business decision it's none of the Court's business. If it is proposed as relief for blacks it is unlawful as there is no showing that the so-called relief applies and is limited to, victims of racial discrimination and is reasonably related to making such victims whole.

Provisions III and IV are somewhat similar in purpose and effect and may be treated together. Provision III allows seasonal employees to transfer to full time positions, some of which were reserved at one time for whites only, as vacancies occur. Provision IV parallels III but specifically includes "Watchman" classification because the company has a separate eligibility list for that position. Since, as mentioned, the pool from which hires shall be made (seasonal workers) is all black, it is clear that "hiring from the pool" is simply another way of saying "hire black." To reiterate, if defendant chooses to hire from its seasonal workers *because* they are seasonal employees it presumably has a right to do so, but it has no right to a court decree requiring that it do so thus protecting it from claims that the facially neutral procedure was a pretext for preferring blacks over whites in hiring.[2]

Again, plaintiffs say that similar relief was granted in *Russell*. We find nothing in *Russell* to indicate that the class of plaintiffs therein were to be given preferential treatment in hiring over outsiders, but in any event, the foregoing distinctions mentioned with regard to Provisions I and II are applicable here. Plaintiffs admit in their brief that they "have not found any evidence of discriminatory hiring for positions in the hourly production unit." They instead speak of present effects of past discrimination but none of the parties explicate upon these effects, if any, nor do they point with any specificity to the victims, no less make any attempt to tailor the relief accordingly. The result, whether intended or not, is preferential treatment of blacks solely on the basis of race.

Provision V adopts a "goal" for the company to obtain in filling its supervisory work force to be met by 1980. Despite plaintiffs' protest to the contrary, this Court sees it for what it is, a quota, plain and simple. With respect to quotas this Court reviewed the law recently in *Cramer v. Virginia Commonwealth University, supra,* and found that sex based quotas were contrary to both the letter and spirit of the law. The parties have cited the Court to no binding authority that the law is any differ-

---

**2.** *But see McAleer v. American Telephone & Telegraph,* 416 F.Supp. 435 (D.C.1976).

ent with respect to racial quotas. The law reviewed earlier in this opinion affirms the conclusion that racial preferences are forbidden in this nation.

## IX

The parties suggest that the decree is intended to overcome the last vestiges of racial discrimination. But the Court perceives no such vestiges. Indeed, the facts admitted by the parties show that with great rapidity and without any decree the artificial racial barriers have completely dissolved at the plant.

The parties further suggest that the decree is a mere redundancy since Executive Order 11246 provides for precisely the procedure and quotas provided for in the Consent Decree. While this Court has held that Executive Order 11246 does not and cannot require racial quotas under our present Constitution and laws, still, if the parties be right this Court has other things to do than enter surplusage in the form of a court order. Court orders are not intended for anything but serious problems.

Finally, the parties say that the mandate of Title VII will be satisfied by adoption of the Consent Decree which is to say that Title VII sanctions preferential treatment and quotas. As we have heretofore demonstrated, Title VII was never so intended. Its strongest supporters specifically and unequivocally disclaimed any intention to turn this country down the mirey road of quotas and racial preferences.

This Court is sympathetic to the need and is aware of the perplexity of rectifying the effects of past racial discrimination and eliminating present racial discrimination. But the mere waving of the banner does not mean that it is appropriately raised; it does not make that which is illegal legal and does not make that which is unjust, just.

In *Quarles v. Philip Morris, Inc.,* 279 F.Supp. 505, 516 (E.D.Va.1967), the Court, speaking with regard to Title VII, stated:

[T]he legislative history indicates that a discriminatory seniority system established before the act cannot be held lawful under the act. The history leads the court to conclude that Congress did not intend to require "reverse discrimination;" that is, the act does not require that Negroes be preferred over white employees who possess employment seniority. It is also apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.

This is the essence of the dilemma courts are faced with in racial discrimination cases. Where the Court has before it victims of discrimination and innocent third parties it has the hard task of fashioning a remedy that will attempt to make the victims whole without unduly affecting the rights of innocent third parties—a difficult problem indeed but one the Court must confront. The problem must be solved by means of equitable relief, not preferential treatment or quotas. The latter two methods serve to evade and perpetuate rather than face the problem. They apply cosmetic relief to the symptoms, but fail to address the substance of the problem. They give employers and unions a safe refuge from the rigors of non-discriminatory hiring; so long as the quota is met they will be safe. Under the Decree proposed herein any relief to victims of discrimination is incidental, persons who do not deserve to benefit, benefit; and persons who do not deserve to suffer, suffer.

A popular theory is that every black is in some sense a victim of racial discrimination and that all whites share the guilt. This notion perhaps makes preferential treatment and quotas more palatable to some. But a Court of law cannot render decisions on the basis of guilt theories nor may such theories be permitted to influence its judicial thinking. A Court is constrained to perceive victims as subjects of violations of the law and is constrained to perceive guilt in terms of legal guilt. The proposed Consent Decree herein, rather than aiding victims of violations of the law, would itself violate the law and victimize innocent people both black and white.

When the parties have settled their differences without a violation of the law and without violating the right of any class members, the Court will enter an appropriate order without prejudice to the right of any person to seek redress for racial discrimination. But this Court will not, by entering the proposed Consent Decree provide the parties with a judicial license to practice racial discrimination.

An appropriate order shall issue.