**UNITED STATES**

v.

**SHERIFF OF LANCASTER COUNTY.**

**Civ. A. No. 83–0136–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

April 11, 1983.
Consent Decree May 6, 1983.

William B. Reynolds, and William B. Fenton, Asst. Attys. Gen., Melissa Page Marshall, Trial Atty., Dept. of Justice, Civil Rights Div., Washington, D.C., Robert W. Jaspen, Asst. U.S. Atty., Richmond, Va., for plaintiff.

Philip P. Purrington, Jr., Commonwealth Atty., Lancaster County, Lancaster, Va., for defendant.

## OPINION

WARRINER, District Judge.

Presently the Court has before it the parties' joint motion for entry of a consent decree. On 7 March 1983, plaintiff United States filed a complaint alleging that defendant Sheriff of Lancaster County unlawfully discriminated on the basis of sex in his employment practices in violation of the 1972 Equal Employment Opportunity Act amendments to Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, et seq. On the same day that the complaint was filed, the proposed consent decree was tendered to the Court with an accompanying brief and a supporting affidavit.

In order to correct the present effects of the past alleged discrimination, Paragraph 1 of the consent decree sets forth the following "objective:"

> In particular, the Sheriff of Lancaster County adopts, and shall seek in good faith to achieve, the objective of employing women in the rank of Field Deputy in the LCSD in numbers which approximate their respective interest in and ability to qualify for such employment under non-discriminatory selection procedures and criteria.

Paragraph 4 of the consent decree provides that:

> The Sheriff of Lancaster County shall immediately adopt and implement an active and continuing recruitment program directed toward increasing substantially the numbers of qualified women applicants for appointment to the rank of Field Deputy in the LCSD in accordance with the purpose and objective of this Decree, as set forth in Paragraph 1.

This language is not clear. But it appears to require that the proportion of women hired to that of men hired correspond to the ratio of interested and qualified women applicants to interested and qualified male applicants. In other words, quota hiring based on applicant flow is contemplated.

Recently, in *United States v. Virginia Department of Highways and Transportation,* 554 F.Supp. 268 (E.D.Va.1983), this Court refused entry of a somewhat similar proposed consent decree. One reason for the refusal, though not the central reason, was the consent decree's requirement of race and sex discrimination in employment through the imposition of quotas based on race and sex. *Id.* at 271–72. The consent decree "refer[red] to quotas by using the euphemism 'goals'." *Id.* at 269, n. 2. The consent decree established, district-by-district, specific percentages for recruitment of black persons and women as immediate and long-term goals; the consent decree also specified that the State would "seek to attract qualified black and female applicants ... so that they constitute 10 and 25 percent respectively of the applicant pool ... on a State-wide basis for each year." Then, the consent decree stated that "[i]t is the expectation of the parties that such hiring and promotion [in accordance with the recruitment goals above] will result in the appointment of blacks and women at levels approximating their representation in the pool of qualified applicants for those positions." Finally, the consent decree stated that the recruitment-cum-hiring goals "are not and will not be treated as quotas. They are, rather, guidelines to assist in the assessment of [the State's] progress toward

achieving a more representative work force."

The Court held that the record in the case afforded the Court no basis upon which the Court could exercise its discretion to enter the consent decree in accordance with the standards adopted by the Fourth Circuit in *Carson v. American Brands, Inc.,* 654 F.2d 300 (4th Cir.1981), and set forth earlier in *Carson v. American Brands, Inc.,* 606 F.2d 420, 430 (4th Cir.1979). Accordingly, and for this reason, the consent decree was refused.

The Court noted, however, that there were additional reasons why the consent decree should be refused. One of these reasons was that the consent decree imposed quotas based on race and sex and that the imposition of such quotas on employment applicants by a State was unconstitutional:

> [T]he question is whether the Commonwealth can engage in racial and sexual discrimination in employment practices contrary to the mandate of the Fourteenth Amendment to the United States Constitution.

> . . . . .

> That the Fourteenth Amendment prohibits race discrimination by a State in any form, manner, guise, or shape, has been so often stated by this Court, by the Fourth Circuit, and by the Supreme Court of the United States that it seems doubtful that any tribunal would give a moment's thought to the idea that a State may make exceptions to the nondiscriminatory rule of the Fourteenth Amendment. The Fourteenth Amendment similarly restricts sex discrimination by a State.

*United States v. Virginia Department of Highways and Transportation,* 554 F.Supp. 268, 271–72 (E.D.Va.1983).

This Court also reiterated its view "that the Equal Protection component of the Fifth Amendment would prohibit a federal court from participating in such discriminatory employment through the device of a consent decree." *Id.* at 269.

After this Court's refusal of the original consent decree in *United States v. Virginia Department of Highways & Transportation, supra,* the parties in that case submitted an amended consent decree. The amended consent decree eliminated the strict hiring quotas set forth in the original consent decree. However, the amended consent decree retained specific percentage district-by-district recruitment goals. The State-wide recruitment goals for black and female applicants, though still firmly fixed at 10 and 25 percent respectively, became mere velleities, the achievement of which was relegated to the parties' "hope". The parties' "expectation" that the numbers of blacks and women hired would approximate their representation in the applicant pool remained. However, the parties added emphatic, repetitive, and unequivocal disclaimers that neither the recruitment goals nor the hiring and promotion expectations were quotas and that neither would be treated as quotas under the consent decree for any purpose. Finally, the goal of achieving a "more representative" work force was deleted.

Thus, in *United States v. Virginia Department of Highways and Transportation,* 554 F.Supp. 268 (E.D.Va.1983), the Court's inquiry became whether the word "expectations," as used in the amended consent decree tendered the Court, constituted "quotas" under another name. In the context of the amended consent decree, read as a whole, the Court concluded that the term expectations as used by the parties did not constitute quotas. The amended consent decree specifically disavowed any attempt to set quotas by any name. Further, and even more persuasively, the brief and affidavit accompanying the amended consent decree emphasized and re-emphasized the philosophical, statutory, and constitutional bars to a judicially imposed quota system (under any name) on an agency of the State.

Under such circumstances, to have voiced suspicion that an expectation was actually a quota in deep camouflage would have been to express suspicion of the veracity of the

affiant, the Assistant Attorney General of the United States for Civil Rights. Not entertaining that suspicion, there was no basis upon which the Court could express suspicion that "expectation" was simply the latest in a long search for an acceptable disguise for race and sex quotas, and hence of race and sex discrimination, in employment. The Court entered the amended consent decree.

At the same time, the Court was and has since been unable to resolve in its mind a legal or rational basis for the presence of expectations in a consent decree. In the instant case and in the above cited case the parties failed to set forth the factual or conceptual basis upon which these employment expectations or objectives were arrived at, justified, and determined. If they are not quotas, then why mention them at all? What place do parties' mere expectations have in a legal document such as a consent decree? If expectations are significant enough to be mentioned, then should not the basis or bases for the expectations be made manifest?

The parties said in *United States v. Virginia Department of Highways & Transportation, supra,* that they expect the percentages of hiring of various applicants will be approximately equal with respect to sex and race as those percentages vary among the applicants. This expectation necessarily presupposes that the only significant difference between the applicants for purposes of employment, on average, will be their sex and their race.

We are all aware of the unfortunate differences that exist between races in such categories as percentages not attending high school,[1] percentages completing high school,[2] percentages behind in high school,[3] percentages completing college,[4] percentages of illiteracy,[5] scholastic aptitude test

1. The United States Civil Rights Commission reported high school nonattendance statistics for the year 1976, which measured the "percentage of the high school age group that is not enrolled in school." Report of the United States Commission on Civil Rights, *Social Indicators of Equality for Minorities and Women 1978,* at 9. The percentages of high school age persons not enrolled in high school were as follows: black males 7%, white males 5%, black females 6%, and white females 6%. Id. at 10. Similar statistics for the year 1960 were as follows: black males 21%, white males 18%, black females 23%, and white females 12%. Id.

2. The United States Civil Rights Commission reported high school completion statistics for the year 1976, which measured the percentage of persons ages 20 to 24 who had completed 12 or more years of school. The percentages were as follows: black males 74%, white males 87%, black females 74%, and white females 86%. Similar statistics for the year 1960 were as follows: black males 41%, white males 69%, black females 42%, and white females 70%. Report of the United States Commission on Civil Rights, *Social Indicators of Equality for Minorities and Women 1978,* at 12.

3. The United States Civil Rights Commission reported delayed education rates for the year 1976, which measured the percentages of students who were two or more years behind the modal grade in school. The percentages of 15, 16, and 17 year-old students who were two or more years behind in school were as follows:

black males 23%, white males 10%, black females 15%, and white females 7%. Similar statistics for the year 1960 were as follows: black males 36%, white males 18%, black females 25%, and white females 10%. Report of the United States Commission on Civil Rights, *Social Indicators of Equality for Minorities and Women 1978,* at 8.

4. The United States Civil Rights Commission reported college completion rates for the year 1976, which measured the percentage of 20 to 29 year-old persons who had completed at least four years of college. The percentages were as follows: black males 11%, white males 34%, black females 11%, and white females 22%. Similar statistics for the year 1960 were as follows: black males 4%, white males 20%, black females 6%, and white females 9%. Report of the United States Commission on Civil Rights, *Social Indicators of Equality for Minorities and Women 1978,* at 14.

5. The United States Bureau of the Census published illiteracy statistics, which measured the percentage of persons "unable to both read and write in any language." *Statistical Abstract of the United States 1981* at 143. The percentages of the population for the year 1979 who were aged 14 and over and illiterate were as follows: black persons 1.6%, white persons .4%. Id. Similar statistics for the year 1959 were as follows: black persons 7.5%, white persons 1.6%. Id.

scores,[6] and the myriads of other testing, achievement, and sociological differences which point to the price that has been paid and is still being paid by members of the black race for past social, political, and economic discrimination.[7]

■ We cannot pretend that these discrepancies do not exist; they do exist; and anyone who reads the newspapers knows they do exist. How then can it be expected, particularly after extensive recruitment for black persons,[8] that the hiring factor and the applicant flow factor will be approximately equal between the races?[9]

Similarly, there are differences between men and women without regard to race. For instance, no one would seriously deny that on average men are stronger and bigger than women. Far more women than men may reasonably be expected to be physically unable to handle as well as males some heavy, laborious jobs in highway construction. How then can it be expected, especially after extensive recruitment for women,[10] that men and women applying for such jobs will be hired in proportion to their respective applications?

To summarize, the emphatic avowals in *United States v. Virginia Department of Highways & Transportation, supra,* that the expectations of the parties as set forth in the decree afforded no basis for entitlement to a judicial remedy under the consent decree, coupled with the dubious nature of the expectations themselves, causes one to wonder why it was insisted that they be included in the amended consent decree. The expectations under such circumstances could serve no legally useful purpose. They could, however, and probably will serve a detrimental and illegal purpose. The employer could take refuge in the protective coloration of the expectations by making hiring and promotion decisions on the basis of sex and race conforming to the expectations so as to evade future legal entanglements and expense to the employer. Further, future administrators less convinced than Assistant Attorney General Reynolds of the illegality and unconstitutionality of quotas may seize upon the expectations language in a consent decree to force his ideas of "benevolent" race discrimination in employment upon prospective employees either through the courts or extra-judicially. The sad record of quota employment leaves no doubt that there are many employers and judges willing to acquiesce in quota ar-

---

6. The Chronicle of Higher Education reported that the College Entrance Examination Board published Scholastic Aptitude Test scores for students who graduated from high school in 1981. Chronicle of Higher Education, Oct. 14, 1982, at 1. The College Entrance Examination Board, in *Profiles, College-Bound Seniors 1981,* reportedly published the following average S.A.T. scores, which are based on a scale from 200–800: black persons 332 on verbal, 362 on mathematics, white persons 442 on verbal, 483 on mathematics. *Id.*

7. One cannot properly infer from the statistics cited above that the differences catalogued by these statistics indicate or prove that the differences are innate. If the differences were innate, one would expect them to remain static. In fact, that these statistics are in a state of flux proves that the differences are not innate.

The percentages cited above are percentages obtained by studies at a particular moment in time. As the evil effects of segregation, discrimination, and political exclusion are dissipated it can reasonably be expected that the discrepancies also will dissipate.

8. The impact of extensive race and sex targeted recruiting on applicant flow and on the eventu-

al applicant pool is uncertain. It is this Court's assumption, however, that the self-recruited person, on average, will be better qualified for the job he seeks than the person who has to be persuaded to apply through recruiting efforts. This supposition rests upon the assumption that persons qualified for a given job are aware that their race or sex would not be an obstacle to employment. In light of the pervasive civil rights legislation in this country during the past 20 years, such an assumption appears valid. *See United States v. Virginia,* 454 F.Supp. 1077, 1115–16 (E.D.Va.1978), *aff'd in part, rev'd in part,* 620 F.2d 1018 (4th Cir.1980).

9. The "gap" depicted by the percentages above, nn. 1–6, is no more an excuse for direct quota hiring than for quotas computed on the basis of applicant flow. Average percentages computed by race or sex are simply irrelevant where hiring and promotion are based on merit no matter by whom advanced—whether employer, employee, union, government, white, black, male, or female.

10. *See* n. 8.

rangements. Whether employees are also willing has not been given substantial consideration.

 It is the view of this Court that the Equal Protection component of the Fifth Amendment prohibits the United States government,[11] absent explicit remedial congressional enactment,[12] from imposing on working men and women employment discrimination based on race and sex. Similarly, it is the view of this Court that the Equal Protection component of the Fifth Amendment prohibits a federal court[13] from participating in or enforcing employment quotas based on race and sex, regardless of whether those quotas are established by the United States, by a State, or by private parties.

 Judicial enforcement by a State court of an agreement to discriminate in property conveyancing on the basis of race is State action in violation of the Equal Protection clause of the Fourteenth Amendment. *Shelley v. Kraemer,* 334 U.S. 1, 23, 68 S.Ct. 836, 847, 92 L.Ed. 1161 (1947). Under similar reasoning, judicial enforcement by a federal court of an agreement to engage in race or sex discrimination in employment practices would be federal action in violation of the Equal Protection component of the Fifth Amendment. This view is not inconsistent with the Supreme Court's decision in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979),[14] which held that race discrimination in employment practices pursuant to a private, voluntary quota plan did not violate Title VII. The *Weber* court emphasized that "we are not concerned ... with what a court might order to remedy a past proved violation of the Act." 443 U.S. at 200, 99 S.Ct. at 2726.

All the above brings the Court to the present consent decree in which the parties agree that defendant must make hiring decisions based on sex so that the percentages of men and women hired approximate the percentages of qualified men and women in the applicant pool.[15]

The present consent decree uses not the word "expectation" but instead it declares that the end sought is an "objective." Objective is a much harder word than expectation. Objective speaks not of that which

---

11. "[T]he Supreme Court of the United States has read the guarantees of the Equal Protection clause [of the Fourteenth Amendment] into the Due Process clause of the Fifth Amendment protecting against arbitrary and capricious federal action," *Carson v. American Brands, Inc.,* 446 F.Supp. 780, 784 (E.D.Va.1977). *See Fullilove v. Klutznick,* 448 U.S. 448, 480, 100 S.Ct. 2758, 2775, 65 L.Ed.2d 902 (1980); *Id.* at 517, n. 2, 100 S.Ct. at 2795, n. 2 (Marshall, J., concurring in judgment); *Id.* at 523, n. 3, 100 S.Ct. at 2798, n. 3 (Stewart, J., dissenting).

12. Involved in this case are not the "broad remedial powers of Congress," which permissibly required racial discrimination in federal contracting projects. *Fullilove v. Klutznick,* 448 U.S. 448, 483, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980). Here, we have only the "limited remedial powers of a federal court," *id.,* which are "not plenary." *Id.* Instead, a federal court "is required to tailor 'the scope of the remedy'" no broader than the evil apprehended. *Id.*

13. *See* n. 11.

14. *See United States v. Virginia Department of Highways & Transportation,* 554 F.Supp. 268, 271 (E.D.Va.1983).

15. In *Sledge v. J.P. Stevens & Co.,* 585 F.2d 625, 644–45 (4th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979), the Fourth Circuit stated that a consent decree requirement that new employees be hired according to their race and sex in numbers that correspond to their respective percentages in the applicant pool constituted a "blanket hiring quota." The Fourth Circuit vacated the applicant flow hiring quota in *Sledge.* 585 F.2d at 650.

The presence of the adjective "qualif[ied]" in the consent decree is not significant. If there be six vacancies with twelve applicants—six male and six female—and all meet the qualifications for the job, the consent decree in this case would contemplate the hiring of three men and three women. But suppose the six women are substantially *better* qualified than the six men. Then law enforcement in the county must make do with less than the best deputies available. More pertinent to this inquiry, three better qualified women must give way to three less qualified men—solely on the basis of their sex.

may in the natural course of events result, but instead speaks of that which must be striven for purposefully and intentionally. An objective is a goal. A goal is a quota.

But even if we shade our eyes from the obvious and accept the comparatively mild disclaimers contained in this consent decree, all the questions and dangers discussed above which arise around the inclusion of expectations and their ganglia in a consent decree apply with even greater force to the objective set forth by the parties in this action.

Accordingly, my question: Why have objectives if they are not objectives? Why pursue hiring in proportion to applicant flow if no one is to be held accountable for a failure to meet that objective? Why clutter up a consent decree with velleities?

Why not, instead, straightforwardly disclaim quotas in any form, require extensive remedial recruitment, make whole all who have specifically suffered employment discrimination at the hands of the defendant, and demand that all hiring decisions be based solely on merit and other permissible considerations but not on race or sex?

 The parties are DIRECTED to review this opinion and revise and resubmit the proposed consent decree to conform to its holding or meet with the Court on the subject matters raised therein by appointment through the judge's secretary. Such status conference, if needed, is to be held within the next 30 days.[16]

And it is so ORDERED.

16. It might well be asked when the parties involved in a dispute have reached a settlement in the form of a consent decree and have evidenced their willingness to be bound thereby, why the Court should concern itself with the niceties of its provisions. A moment's reflection would reveal that the question is ridiculous. Suppose that the parties agreed to settle a dispute in the form of a consent decree under which plaintiff agreed to hold Bill Smith while defendant shot Smith dead. The mere fact that the parties agreed to this arrangement should not prevent a court from robbing the parties of their bargain. *But see Carson v. American Brands, Inc.,* 450 U.S. 79, 86, 101 S.Ct. 993, 998, 67 L.Ed.2d 59 (1981). (Without appellate re-

view of a district court's refusal to enter a consent decree, "petitioners might lose their opportunity to settle their case on negotiated terms.")

Far from being obligated to accept the parties' bargain memorialized in a consent decree, the Court, wholly bereft of the aid of the adversarial process, must be particularly careful to review a consent decree with care to satisfy itself that the parties' pursuit of their own interests through the medium of a consent decree does not adversely affect the interests of unrepresented parties and does not violate the laws or the Constitution or, as in this case, both.

## CONSENT DECREE

The United States filed this action against the Sheriff of Lancaster County, alleging, *inter alia,* that the Sheriff of Lancaster County was engaged in policies and practices that discriminate against women and that deprive or tend to deprive women of employment as Field Deputies in the Lancaster County Sheriff's Department (the "LCSD"), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

The Sheriff of Lancaster County expressly denies that he is presently, or in the past has been, engaged in policies and practices that discriminate against women or that deprive or tend to deprive women of employment as Field Deputies in the LCSD, as alleged by the United States. However, the Sheriff of Lancaster County realizes that the fact that the LCSD never had a woman employed as a Field Deputy until December 1982, former Sheriff Garland Forrester's publicized view that he would not consider employing women in the rank of Field Deputy because he did not think that they could perform the duties of Field Deputy, and the Sheriff of Lancaster County's rejection of Deborah Lamb for appointment as a Field Deputy in the LCSD, may give rise to an inference that discrimination has occurred.

The United States and the Sheriff of Lancaster County—desirous of avoiding the burden, expense and uncertainty of contested litigation, and desirous of eliminating any disadvantage to women that may have

resulted from any alleged unlawful past practices with respect to the employment of Field Deputies in the LCSD—hereby agree and consent to the entry of this Decree.

The parties signatory hereto, by agreeing and consenting to the entry of this Decree, stipulate to the jurisdiction of the Court over this action, and waive a hearing and the entry of findings of fact and conclusions of law on all issues involved herein. However, this Decree shall constitute neither an admission by the Sheriff of Lancaster County nor an adjudication by this Court on the merits of the allegations of the United States.

Lastly, this Decree is final and binding between the parties signatory hereto and their successors as to the issues resolved herein, as well as upon Deborah Lamb.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

## I

### GENERAL

1. The major purpose of this Decree is two-fold: to ensure that women are considered for employment by the Sheriff of Lancaster County as Field Deputies in the LCSD on an equal basis with men, and to ensure that the present effects of the Sheriff of Lancaster County's policies and practices that are alleged unlawfully to have discriminated against women and to have deprived or tended to deprive women of employment in the rank of Field Deputy are corrected. In particular, the Sheriff of Lancaster County shall seek in good faith to employ women in the rank of Field Deputy in the LCSD in accordance with non-discriminatory selection procedures and criteria. It is recognized that the process of increasing the number of women applicants for appointment to the rank of Field Deputy in the LCSD is facilitated by a process free of unlawful barriers to their entry and by a substantial increase in recruitment efforts by the Sheriff directed toward women. Nothing in this Decree, however, is intended nor shall it be construed to require or to permit a quota or other sex-based preference in any form. Further, nothing in this Decree is intended nor shall it be construed to require or to permit the Sheriff of Lancaster County to appoint any person to the rank of Field Deputy who is not qualified by job related standards, or to grant a preference in appointment to the rank of Field Deputy to a person who is less qualified over a more qualified person, where qualifications are measured by job related standards.

2. The Sheriff of Lancaster County, and his officials, employees, agents and all persons in active concert or participation with them, hereafter are enjoined from engaging in any act or practice with respect to the recruitment, hire or appointment of applicants for employment in the LCSD, or the training, assignment, transfer, promotion, discipline, retention, compensation, or terms and conditions of employment of employees in the LCSD, which has either the purpose or the effect of unlawfully discriminating against women on the basis of sex.

3. The Sheriff of Lancaster County hereafter shall not engage in any employment policy or practice with respect to pregnancy, childbirth or any other related medical condition affecting applicants for employment or employees in the LCSD which unlawfully discriminates against employees on account of pregnancy, childbirth or related conditions. In particular, an employee disabled by pregnancy or childbirth or a related medical condition shall be treated no less favorably than employees disabled by other causes.

4. The Sheriff of Lancaster County shall immediately adopt and implement an active and continuing recruitment program directed toward increasing substantially the numbers of qualified women applicants for appointment to the rank of Field Deputy in the LCSD in accordance with this Decree.

5. Within thirty (30) days from the date of entry of this Decree, the Sheriff of Lancaster County shall cause to be placed in the *Rappahannock Record* and the *Richmond Times-Dispatch* a notice which:

(1) Emphasizes that the Sheriff is an Equal Employment Opportunity employer;

(2) Emphasizes the Sheriff's active and continuing recruitment program on behalf of women for appointment to the rank of Field Deputy in the LCSD;

(3) Summarizes the qualifications required for that rank;

(4) Provides information as to the method by which application for appointment to that rank must be made; and

(5) Specifically invites women, as well as men, to apply for that rank, and states the name, address and telephone number of the official or employee in the LCSD to which inquiries and requests for applications may be made.

Such notice shall be not less than three inches square in size, shall be placed in the main sections of both newspapers for not less than four consecutive days, and shall be approved as to both substance and form by the United States prior to its placement by the Sheriff.

## II

### INDIVIDUAL RELIEF

6. The parties agree that: Deborah Lamb first sought employment with the Sheriff of Lancaster County as a Field Deputy in the LCSD in August 1976; Ms. Lamb was not appointed as a Field Deputy in the LCSD; and, had she been appointed as a Field Deputy in the LCSD following her August 1976 application, such appointment would have occurred at least by December 6, 1976.

7. The United States contends that Ms. Lamb was qualified for appointment to the rank of Field Deputy in the LCSD when she first sought that job in August 1976 and at all times thereafter, and that the Sheriff of Lancaster County failed or refused to appoint her as a Field Deputy solely on account of her sex.

8. Without admitting to the contentions of the United States as set forth in Paragraph 7, *supra,* and in settlement of the claim of the United States for relief on behalf of Deborah Lamb, as well as Ms. Lamb's individual claim, the Sheriff of Lancaster County agrees, and it is hereby ordered, that the Sheriff shall:

a. Within five (5) days from the date of entry of this Decree, appoint Ms. Lamb as a full-time Field Deputy in the LCSD, with all of the emoluments of that rank, including but not limited to retroactive seniority for all purposes in that rank as of December 6, 1976;

b. Upon appointment, provide Ms. Lamb with that on-the-job training which the Sheriff has routinely and historically provided to new employees appointed as Field Deputies in the LCSD; and

c. Subject to and upon the payment by Ms. Lamb to the State-administered pension fund of that sum of money sufficient to satisfy fully and completely all employee contributions to that fund had she been employed as a Field Deputy in the LCSD since December 6, 1976, immediately pay into that pension fund on her behalf that sum of money sufficient to satisfy fully and completely all employer contributions to such fund since December 6, 1976; and the Sheriff of Lancaster County, through the Virginia Retirement System, thereafter shall provide Ms. Lamb with full and complete pension benefits as though she had been appointed as a Field Deputy in the LCSD on December 6, 1976, and thereafter employed continuously in that rank in the LCSD, and as though the Sheriff and she regularly, timely and fully had contributed to such fund on her behalf. That sum of money already paid by Ms. Lamb into such pension fund during the course of her employment, since December 6, 1976, with employers covered by such pension fund shall, to the extent not withdrawn from such fund by her, be used to offset her obligations under this subparagraph 8c.

9. The Sheriff of Lancaster County shall not retaliate or in any respect adversely affect Deborah Lamb because of either her filing of EEOC charges against the Sheriff or her participation in or cooperation with this action.

## III

### REPORTING AND RECORDKEEPING

10. The Sheriff of Lancaster County shall submit to the United States annually by service upon the undersigned counsel for the United States, commencing within twenty (20) days after the first annual anniversary of entry of this Decree, a report which sets forth the total number of personnel (sworn and non-sworn, full and part-time) employed in the LCSD as of the end of that twelve-month period, with a numerical breakdown by rank (if sworn), job (if non-sworn), and sex.

11. The Sheriff of Lancaster County shall retain during the life of this Decree, and shall make available to the United States for inspection and copying upon written request, all documents, records or other memoranda pertaining to the recruitment, selection, hire, assignment, transfer, promotion, demotion, discipline and termination of all personnel in the LCSD.

12. In addition, the Sheriff of Lancaster County shall retain during the life of this Decree, and shall make available to the United States for inspection and copying upon written request, all reports, documents, records or other memoranda pertaining to the Sheriff's compliance with this Decree.

## IV

### COSTS

13. The United States and the Sheriff of Lancaster County shall bear their own costs of this action, and the Sheriff of Lancaster County shall bear all court costs.

## V

### RETENTION OF JURISDICTION

14. This Court shall retain jurisdiction of this action for the purpose of entering all orders, judgments and decrees which may be necessary to implement that relief provided herein. Any time after four (4) years following the date of entry of this Decree, the Sheriff of Lancaster County may move the Court, upon ninety (90) days notice to the United States, for a dissolution hereof. The Sheriff of Lancaster County shall be entitled to such dissolution of this Decree, if it has complied with this Decree in all material respects.