577 F.2d 943
 17 Fair Empl.Prac.Cas. 1344, 17 Empl. Prac.
Dec. P 8522,
84 Lab.Cas. P 10,746
 Mrs. Bernice B. SINYARD et al., Plaintiffs-Appellants,
v.
FOOTE & DAVIES DIVISION OF McCALL CORPORATION, a corporation
doing business in Georgia, et al., Defendants,
International Brotherhood of Bookbinders, a labor union
(Graphic Arts International Union), Defendant-Appellee,
Eula Buchanan, Plaintiff-Intervenor.
 No. 76-3422.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 4, 1978.
 
 Margie Pitts Hames, Mary Ann B. Oakley, Atlanta, Ga., for plaintiffs-appellants.
 Martin R. Ganzglass, Washington, D. C., for International Brotherhood of Bookbinders.
 Morgan C. Stanford, Atlanta, Ga., for Graphic Arts Union Local.
 Appeal From the United States District Court For the Northern District of Georgia.
 Before WISDOM, TJOFLAT and VANCE, Circuit Judges.
 VANCE, Circuit Judge.
 
 
 1
 This class action was brought by five female employees of Foote & Davies Division of McCall Corporation against the company, the International Brotherhood of Bookbinders (now Graphic Arts International Union, hereinafter "International"),[1] and Atlanta Bookbinders' and Binderywomen's Union Local 96 (now Graphic Arts International Union Local 96B, hereinafter "Local"). Suit was brought originally under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. By amendment plaintiffs alleged violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and of the union's duty of fair representation.
 
 
 2
 On April 25, 1975, the district court granted International's motions for summary judgment as to the original complaint and as to the 1972-74 collective bargaining agreement. On February 10, 1976 summary judgment was granted in the International's favor on the amended complaint. Final judgment in favor of the International was entered on June 25, 1976.
 
 
 3
 This appeal by the female employees turns on whether the International has a responsibility and duty to eliminate discriminatory practices arising from a collective bargaining agreement under facts unlike those with which this court usually has been confronted.
 
 LIABILITY UNDER TITLE VII AND EQUAL PAY ACT
 
 4
 In granting International's motion for summary judgment of the Title VII claim, the district court noted that its potential liability must be predicated on the collective bargaining agreements.[2] It found that there was no genuine issue of material fact as to the International's relationship with the Local or as to the International's lack of any responsibility for the collective bargaining agreements. From uncontroverted affidavits and exhibits the district court found that the president of the Local conducted all of the negotiations leading up to the execution of the relevant agreements, that the International did not participate in the negotiations, and that the International refused to sign the agreements because they violated the International's policy of limiting working hours to 37.5 hours per week.[3] The district court stated:
 
 
 5
 Absent some other controlling factor, given the lack of control over the negotiation of the collective bargaining agreements alleged to be violative of Title VII, and given the fact that the International was not a party to the agreements, the International may not be held liable for the discriminatory provisions of those agreements. See Herrera v. Yellow Freight System, Inc., 505 F.2d 66, 68 n. 2 (5th Cir. 1974); Resendis v. Lee Way Motor Freight, Inc., 505 F.2d 69, 71 n. 2 (5th Cir. 1974).
 
 
 6
 Since the claimed Equal Pay Act violations are also tied to the provisions of the collective bargaining agreement, the district court again noted:
 
 
 7
 (The) plaintiffs have failed to produce any evidence tending to show participation in or authorization of negotiations leading to the purportedly discriminatory collective bargaining agreement . . . .
 
 
 8
 Consequently, partial summary judgment on that issue was also granted.
 
 
 9
 Appellants argue that the International, "should and must assume some degree of responsibility for violations of Title VII by one of its locals, should such violations be proven at trial," and that, "an international has an affirmative duty to correct discriminatory practices by one of its locals."
 
 
 10
 To support these statements appellants point to our opinions in Myers v. Gilman Paper Corp., 544 F.2d 837 (5th Cir. 1977), modified on rehearing, 556 F.2d 758 (5th Cir. 1977), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); in Sagers v. Yellow Freight System, Inc., 529 F.2d 721 (5th Cir. 1976) and to the fourth circuit's opinion in Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir. 1976), which was expressly approved by this court in Myers. In what probably would be a more usual factual context appellants' argument is valid. This is not to say, however, that is in invariably so. The precedents on which appellants rely do not sanction our blanket imposition of an affirmative duty on international unions to police their locals to insure nondiscrimination an undertaking which on occasion may be beyond their capacity.
 
 
 11
 As a general proposition, however, international labor unions must bear a heavy responsibility in giving effect to the remedial provisions of both Title VII and the Equal Pay Act. International unions, along with regional and local unions, may incur liability for discriminatory effects of contract provisions found in collective bargaining agreements. In Myers this court said that, "(l)abor organizations, as well as employers have an affirmative duty to take corrective steps to prevent the perpetuation of past discrimination." Myers, supra at 850. But that duty is not absolute under all circumstances. In a situation such as is now before the court, it is based on the relationship between the international and the local and the amount and type of involvement which the international has with the collective bargaining agreement. In Myers we also held: "There must be a 'sufficient connection' between the labor organization and the discriminatory practice to render the organization liable." Id. at 851. Whether the international union is or is not liable depends on the circumstances of each situation.
 
 
 12
 In Sagers v. Yellow Freight System, Inc., supra at 737, the court stated:
 
 
 13
 (T)he record before us in the instant case clearly establishes that the connection between the International and the contracts in issue was sufficient to hold the International liable long with the regional and local unions.
 
 
 14
 In that case the contracts governing all teamster locals were negotiated by a national negotiating committee.
 
 
 15
 The obvious influence of the International on the National Negotiating Committee, and thus, indirectly, on the negotiation of the National and supplemental agreements, is clear from the record. Id.
 
 
 16
 The international union's liability in Patterson v. American Tobacco Company, supra, was based on the fact that an international vice president acted as an "advisor" to the local in its negotiations and the international approved the resulting collective bargaining agreement.
 
 
 17
 The "sufficient connection" between the labor organization and the discriminatory practice found in Myers to support the international's liability was described as follows:
 
 
 18
 Here the international established a close relationship with its locals, under which the international would generally provide advisors who would review and often comment upon the local's bargaining positions. An additional aspect of the relationship was the international's requirement that locals submit contracts to it for its approval. . . . As far as third parties were concerned, the international gave its imprimatur to local contracts by providing contract advisors and approval of the final agreement. Myers, supra at 851.
 
 
 19
 In the instant case we are confronted by a markedly different set of facts. The International did not directly or indirectly participate in negotiating either of the relevant bargaining agreements,[4] was not signatory to either agreement, did not approve either agreement and expressly refused to execute the agreements. There is no suggestion that the International's presence as a defendant is necessary to any remedy claimed by appellants. Nonetheless, because of International's constitution and its receipt of funds from the Local appellants argue that a basis of liability exists.
 
 
 20
 The constitution and the laws of the International states that it shall have "full power" to regulate its locals, to issue and recall local charters, "to take any and all . . . actions as may be necessary and appropriate to accomplish its objectives." It also states that collective bargaining contract proposals must be approved by the president of the International before they are adopted by the membership of a local, and that the contracts themselves shall be subject to the International President's approval.[5]
 
 
 21
 These constitutional provisions bear similarity to comparable provisions in Patterson v. American Tobacco Company, supra, where liability was imposed on the international. In Patterson, however, the international participated in negotiations by providing an advisor and ultimately by approving the bargaining agreement. The significance of the provisions to a determination of liability was made clear by the fourth circuit's statement that "(T)he International's approval of the bargaining agreement pursuant to this provision made it jointly responsible with the local." Id. at 271. Here the opposite was true.
 
 
 22
 Appellants suggest that the policy of the law will be contravened if the International receives financial payments from local union members in the form of a per capita tax and provides no quid pro quo in return. This overlooks that the dues and the per capita tax depend on membership and not on a particular collective bargaining agreement. The benefits of affiliation with an international union do not begin and end with the international's involvement in negotiations resulting in a collective bargaining agreement. This is only one of the many benefits available to locals and members through this particular international organization.[6]
 
 
 23
 We recognize that in many situations it is the local's decision to take advantage or not to take advantage of the services and assistance provided by its international, just as in some instances a local is in a position to decide whether it will or will not conform to the mandates of the international constitution. The diverse situations possible in the varied relationships between parent and local unions make individual examination of the facts, rather than a mechanical application of assumptions, a vital necessity.
 
 
 24
 We emphasize the particular facts before us because our opinion turns on what is probably an exceptional, rather than the usual, situation. The record here shows that Truitt Crunkleton, the president of Local 96B, was completely in control of the Local's affairs. The International was not requested to assist in negotiations and did not do so either directly or behind the scenes. The International did not approve the collective bargaining agreements in question and was not signatory thereto. As a matter of history the International had not caused or participated in and did not approve the condition complained of. We agree with the district court that there was not sufficient connection between this International and the discriminatory provisions of the collective bargaining agreement to impose liability on the International. Had Local 96B received the advice, assistance or approval of the International during or after negotiations we would be presented with a different situation. Absent any involvement whatever by the International summary judgment was proper.
 
 LIABILITY FOR DUTY OF FAIR REPRESENTATION
 
 25
 As to plaintiffs' claim that the International union breached its duty of fair representation the district court stated:
 
 
 26
 The duty of fair representation arises solely from the union's status as exclusive bargaining representative under 29 U.S.C. § 159(a) . . . . Since it is apparent from the record that the defendant Local Union was the only Union designated as the exclusive bargaining agent, no liability for breach of the duty of fair representation can attach to the conduct of the International Union herein . . . .
 
 
 27
 The district court concluded that since there was no dispute that the Local union was plaintiffs' exclusive bargaining representative, summary judgment was appropriate to dispose of the claimed liability of the International for breach of the duty of fair representation, citing Lomax v. Armstrong Cork Co., 433 F.2d 1277 (5th Cir. 1970); Turner v. Air Transport Dispatchers' Association, 468 F.2d 297 (5th Cir. 1972). We agree.
 
 
 28
 Appellants urge reversal because the 1970-72 collective bargaining agreement does not expressly state that Local 96B is the exclusive bargaining agent but specifies:
 
 
 29
 THIS AGREEMENT is entered into . . . between FOOTE & DAVIES . . . and the ATLANTA BOOKBINDERS LOCAL UNION NO. 96 subordinate to the International Brotherhood of Bookbinders . . . . (emphasis added).
 
 
 30
 This somewhat ambiguous contract language alone will not support appellants' position. The duty of fair representation arises not from the collective bargaining agreement but out of the power to act as exclusive bargaining representative. Mumford v. Glover, 503 F.2d 878 (5th Cir. 1974); Smith v. Sheet Metal Workers, Local 25, 500 F.2d 741 (5th Cir. 1974); Sanderson v. Ford Motor Co., 483 F.2d 102 (5th Cir. 1973). The constitution of Graphic Arts International Union provides that the local "shall be the exclusive representative of each member for purposes of collective bargaining and the execution of collective bargaining agreements . . . ."[7] More importantly the evidence before the district court showed that in reality Local 96B was the exclusive bargain representative.[8]
 
 
 31
 There is no indication in the record that anyone other than Local 96B was the exclusive bargaining representative of employees at Foote & Davies.
 
 
 32
 (O)ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial, or at the very least stating reasons why he cannot do so. Gossett v. Du-Ra-Kel Corp., 569 F.2d 869, 872 (5th Cir. 1978).
 
 
 33
 Since there were no material facts or inferences in dispute, summary judgment was appropriate.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 The Graphic Arts International Union is the result of a merger which occurred on September 4, 1972 between the Lithographers and Photoengravers International Union and the International Brotherhood of Bookbinders
 
 
 [2]
 The complaint alleges sex discrimination on part of all three defendants with respect to several discriminatory provisions in the collective bargaining agreement relating to conditions of their employment and pay, for example, segregation of jobs into journeymen (male) and journeywomen (female) classification. Men have always been paid from $1.50 to $1.80 per hour more than women. Disparate promotional opportunities, insurance and other benefits were also alleged
 
 
 [3]
 Affidavit of Truitt L. Crunkleton, President of Local 96B:
 I have conducted all negotiations on behalf of my Local with Foote & Davies, Inc. which resulted in agreements with said company for the years 1970-1972 and 1972-1974. Neither I nor anyone else represented the International Brotherhood of Bookbinders (now known as Graphic Arts International) during the negotiation of these contracts. The International Brotherhood of Bookbinders and its successor Graphic Arts International took no part in the negotiation of said contracts and neither organization was signatory to these agreements.
 Affidavit of Leon M. Wickersham, Executive Assistant to the President of International:
 No official of the International Brotherhood of Bookbinders participated in the contract negotiations (resulting in the 1970-72 agreement) which were carried out by Local President Truitt Crunkleton and members of the Local Bargaining Committee.
 . . . (T)he International Brotherhood of Bookbinders never approved the 1970 collective bargaining agreement between Local 96-B and Foote & Davies, no International officer signed this agreement, and there is no signed copy bearing the signature of any International officer.
 
 
 [4]
 The two relevant bargaining agreements were effective from October 16, 1970 though October 15, 1972 and from October 16, 1972 through October 13, 1974
 
 
 [5]
 Constitution and Laws, Graphic Arts International Union
 Ch. 14.1 Proposals. All proposals for collective bargaining negotiations shall be submitted to the International and approved by the International President prior to their final adoption by the membership and presentation to any employer . . .
 Ch. 14.2 Contracts. All collective bargaining contracts shall be subject to approval by the International President.
 
 
 [6]
 The Graphic Arts International provides the following various funds and plans for its membership: emergency defense fund, death benefits fund, pension and welfare fund and plan, mortuary fund and plan, and an educational training and retraining program
 The constitution established the following committees which point out the areas of interest which benefit locals: Organizing Committee; Benefit Plans Committee; Finance Committee; Grievance and Appeals Committee; Local Unions Committee; Technological, Development, Education, Training and Apprentices Committee; and the Legislative Committee.
 The constitution also provides for an international publication to enable the dissemination of information relating to matters of interest to the International and its locals.
 
 
 [7]
 The constitution further provides in Chapter V, Duties of Local Officers:
 Ch. 5.2 The Local President . . . . He shall direct the organizing, negotiating and other like activities of the Local.
 
 
 [8]
 The affidavit of Walter F. Barber, who was secretary-treasurer of Local 92 in 1937, states that a majority of employees signed authorization cards designating Local 96 as exclusive bargaining representative for the employees at Foote & Davies. Mr. Zato, Plant Manager and Vice President of Foote & Davies, agreed to recognize the Local as bargaining representative for employees at his plant. The company recognized the Local as exclusive bargaining representative and not the International. Since the inception of the relationship between Foote & Davies and the union, the Local has exclusively represented employees of Foote & Davies